# EXHIBIT C

A. ____

(No. 06-1196)

IN THE SUPREME COURT OF THE UNITED STATES
_____

IN RE KHALED A.F. AL ODAH,
NEXT FRIEND OF FAWZI KHALID ABDULLAH
FAHAD AL ODAH, *et al.*, PETITIONERS,

*v.*

UNITED STATES, ET AL.
_____

EMERGENCY APPLICATION FOR STAY OF MANDATE AND
FOR ORIGINAL WRIT OF INJUNCTION
_____

To the Honorable John G. Roberts, Chief Justice of the United States and Circuit Justice of the United States Court of Appeals for the District of Columbia Circuit:

Pursuant to 28 U.S.C. § 2101(f) and 28 U.S.C. § 1651, Petitioners respectfully request a stay of the mandate of the United States Court of Appeals in *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007) ("*Boumediene I*"), and other appropriate injunctive relief, pending Petitioners' filing of a petition for rehearing on or before April 27, 2007. *See* S. Ct. Rule 44. Petitioners will ask that the Court defer its consideration of the rehearing petition until (1) Petitioners have exhausted their remedies in the Court of Appeals under the Detainee Treatment Act of 2005 ("DTA"), or (2) those remedies have proven to be so protracted or delayed as to compromise "the offices and purposes of the writ of habeas corpus." *Boumediene v. Bush*, 127 S. Ct. 1478, 1478 (2007) ("*Boumediene II*") (statement of Justices Stevens and Kennedy respecting the denial of certiorari) (citation omitted).

The relief sought is analogous to a stay-and-abey order entered by a district court where a habeas petitioner has failed to exhaust all available remedies in state courts and, rather than dismissing the action, the district court stays the action while the petitioner exhausts his state-court remedies. *See Rhines v. Weber*, 544 U.S. 269, 277 (2005). Such relief is essential here to preserve the status quo in the lower courts while Petitioners endeavor to exhaust their DTA remedies as a precondition to their seeking reconsideration by the Court of its denial of certiorari. Such relief is necessary to ensure that counsel can continue to communicate with and visit their clients detained at Guantánamo Bay, that the DTA cases proceed in an orderly fashion, and that Petitioners may pursue their habeas corpus claims in the District Court should this Court ultimately find Petitioners entitled to do so.

Absent the relief sought, the government – which maintains that Guantánamo detainees have *no* legal rights whatsoever – will completely control the terms and conditions of communications between the detainees and their counsel, at least until the Court of Appeals establishes procedures to govern DTA actions.[1] The government also will be free to transfer the detainees from Guantánamo to countries or facilities where they may be tortured or abused, and by transferring the detainees from Guantánamo effectively defeat the jurisdiction of the federal courts. Finally, document preservation orders entered in these cases will lapse, and counsel will be required to destroy their files within 60 days after the cases are dismissed. Prefiguring things to

---

[1]     A motion to govern two DTA actions filed by other detainees is pending in the Court of Appeals, *Bismullah v. Gates*, D.C. Cir. No. 06-1197; the motion is scheduled for argument on May 15, 2007. A pending DTA action, *Paracha v. Gates*, No. 06-1038, will not be heard until September 27, 2007.

come, the government is already cautioning counsel that their visits to Guantánamo are being approved "provided that the District Court PO [protective order] remains extant." [2]

## STATEMENT

Petitioners are nearly 60 foreign nationals held by the United States at Guantánamo Bay Naval Base, Cuba. Many have been held at Guantánamo for more than five years. None is a citizen of a nation at war with the United States. All filed habeas corpus actions in the United States District Court for the District of Columbia Circuit. Petitioners' ability to pursue those actions is the nub of this case.

### A.    The Detainees' Habeas Actions

In the wake of the September 11, 2001 terror attacks, the United States took into custody all over the world thousands of foreign nationals. Beginning in January 2002, the United States transported over 800 of these foreign nationals to detention facilities at Guantánamo Bay Naval Base. More than 350 detainees are estimated to be held there today. Virtually all of the detainees are being held at Guantánamo on the basis of their designation by the government as unlawful "enemy combatants."

In the spring of 2002, a number of Guantánamo detainees filed habeas actions. The government moved to dismiss, contending that the federal courts lacked jurisdiction over the actions because Guantánamo is not sovereign U.S. territory. In *Rasul v. Bush*, 542 U.S. 466 (2004), the Court rejected the government's contention, holding that the federal courts had habeas jurisdiction under 28 U.S.C. § 2241 because Guantánamo is United States territory for all practical pur-

---

[2]    *See* Email to Caridad Feria-Perez from Shannon A. Llenza, Office of General Counsel, Legal Counsel, Department of Defense, dated Apr. 13, 2007; Email to Sarah Jackel, from Shannon A. Llenza, Office of General Counsel, Legal Counsel, Department of Defense, dated Apr. 13, 2007. These emails are attached as Exhibit A.

poses. Stating that petitioners' allegations "unquestionably describe 'custody in violation of the Constitution or laws or treaties of the United States,'" the Court remanded for the District Court to "consider . . . the merits of petitioners' claims." *Rasul*, 542 U.S. at 484 & n.15.

In the weeks immediately following *Rasul*, next friends of Guantánamo detainees filed a dozen additional habeas actions in the District Court. Instead of answering the petitions by filing factual returns, *see* 28 U.S.C. § 2243, however, the government moved to dismiss the petitions. The government argued that *Rasul* had simply held that 28 U.S.C. § 2241 gave federal courts *jurisdiction* over habeas actions brought by the detainees, but that, as foreign nationals held outside the sovereign territory of the United States, the detainees had no *rights* that could be enforced through habeas.

The habeas actions had been assigned in the normal course to nine of the judges of the District Court. By order dated August 17, 2004, the District Court's Calendar and Case Management Committee designated Judge Joyce Hens Green "to coordinate and manage all proceedings in the pending matters and, to the extent necessary, rule on procedural and substantive issues common to the cases." *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443, 451 (D.D.C. 2005). Judge Green ordered the government to provide counsel with factual returns and allow counsel visits to their clients in Guantánamo pending consideration of the government's motion to dismiss.

Shortly after the Court issued its decision in *Rasul*, the government established "Combatant Status Review Tribunals" ("CSRTs") to determine whether each detainee's prior designation as an "enemy combatant" was justified. The CSRTs were to make this determination on the basis of classified evidence supplied by the government and any evidence supplied by the detainee. In response to Judge Green's direction to file returns in the habeas actions, the government filed

for each detainee the record of his CSRT proceeding, although the government provided only redacted versions of some of the classified portions of the returns.

### B.    Ruling on Right to Counsel

At the outset of the habeas proceedings that *Rasul* allowed, the government attempted to limit the relationship between Petitioners and their counsel.  On October 20, 2004, District Judge Kollar-Kotelly ruled that Petitioners had a right to counsel in order to effectively present their habeas claims in the District Court.  *Al Odah v. United States*, 346 F. Supp. 2d 1, 8 (D.D.C. 2004).  She found that "[t]he circumstances of [Petitioners'] confinement render their ability to investigate nonexistent"; that it "[wa]s simply impossible to expect [Petitioners] to grapple with the complexities of a foreign legal system and present their claims to this Court without legal representation"; and that the District Court's "ability to give [Petitioners'] claims the 'careful consideration and plenary processing' which is their due would be stymied were [Petitioners] to proceed unrepresented by counsel."  *Id.*  Judge Kollar-Kotelly then rejected the government's proposal of audio and video monitoring of meetings between detainees and counsel and *post hoc* "classification review" by the government of notes taken during those meetings and of legal mail between counsel and detainees, finding that the proposed measures would "inappropriately burden [the attorney-client] relationship."  *Id.* at 9.

### C.    The Protective Order

The government in due course moved for a protective order and procedures to govern counsel access to and communications with their Guantánamo clients and other matters relating to the representation.  At Judge Green's request, counsel for the government and counsel for the detainees negotiated a proposed protective order.  Judge Green, resolving lingering issues and making modifications of her own, issued the protective order on November 5, 2004 and an amended version of the order on November 8, 2004.  *See In re Guantanamo Detainee Cases*, 344

F. Supp. 2d 174 (D.D.C. 2004). The court's November 8 order, which set out the amended protective order and related procedures, provides in pertinent part:

> 1. The Court finds that these cases involve classified national security information or documents, the storage, handling and control of which require special security precautions, and access to which requires a security clearance and a "need to know." These cases may also involve other protected information or documents, the storage, handling and control of which may require special precautions in order to protect the security of United States government personnel and facilities, and other significant government interests.

> 2. The purpose of this Protective Order is to establish the procedures that must be followed by all petitioners' counsel, their respective petitioner(s), all other counsel involved in these cases, translators for the parties, and all other individuals who receive access to classified national security information or documents, or other protected information or documents, in connection with these cases, including the privilege team as defined in Exhibit A.

> 3. The procedures set forth in this Protective Order will apply to all aspects of these cases, and may be modified by further order of the Court *sua sponte* or upon application by any party. The Court will retain continuing jurisdiction to enforce or modify the terms of this Order.

>     * * *

> 6. Petitioners' counsel are bound by the terms and conditions set forth in the "Revised Procedures For Counsel Access To Detainees At the U.S. Naval Base In Guantanamo Bay, Cuba," and the procedures for handling mail and documents brought into and out of counsel meetings, attached hereto as Exhibit A. This Protective Order specifically incorporates by reference all terms and conditions established in the procedures contained in Exhibit A to the extent they place limitations on petitioners' counsel in their access to and interaction with petitioners or handling of information. Any violation of the terms and conditions of those procedures will also be deemed a violation of this Protective Order. This paragraph does not apply with respect to provisions in the procedures contained in Exhibit A that are or have been overridden by the Court.

> 7. The privilege team shall not disclose to any person any information provided by counsel for a petitioner or by a petitioner, other than information provided in a filing with the Court, unless such information, if it were monitored information, could be disclosed under Section X of Exhibit A. Such disclosure shall be consistent with the provisions of Section X of Exhibit A.

344 F. Supp. 2d at 174. The protective order, which is set out in Judge Green's opinion, provides for and governs counsel access to and handling of classified and protected information and

documents, *id.* at 178-82; procedures for filing court documents, *id.* at 182-83; document posses-

sion and retention, *id.* at 182, and penalties for unauthorized disclosure, *id.* at 183.  The District

Court has also issued broad document preservation orders to govern during the pendency of the

habeas actions.  *See*, *e.g.*, Order, *Abdah v. Bush*, Civil Action 04-1254 (HHK) (June 10, 2005);

Memorandum Opinion and Order, *Jamil El-Banna v. Bush*, Civ. No. 04-1144 (RWR) (July 18,

2005).  These orders are attached as Exhibit B.

Paragraph 45 of the protective order, however, requires the destruction of all protected

documents and information within 60 days after the resolution of the actions and the termination

of any appeals therefrom, including documents prepared by and information gathered by de-

tainee counsel and by the government.  The government is permitted to keep a set of those mate-

rials that have been presented to the Court, but the government is not required to preserve even

that limited set of materials:

> Within sixty (60) days of the resolution of these actions, and the termination of
> any appeals therefrom, all protected documents or information, and any copies
> thereof, shall be promptly destroyed . . . . [C]ounsel for the government *may* re-
> tain one complete set of any such materials that were presented in any form to the
> Court. . . .  In any subsequent or collateral proceeding, a party may seek discovery
> of such materials from the government, without prejudice to the government's
> right to oppose such discovery or its ability to dispose of the materials pursuant to
> its general document retention policies.

*Id.* at 182 (emphasis added).

### D.     Counsel Access Procedures

"Revised Procedures For Counsel Access To Detainees At the U.S. Naval Base In Guan-

tanamo Bay, Cuba," Exhibit A to the protective order, sets forth detailed procedures governing

such matters as counsel visits to Guantánamo to meet with their clients, 344 F. Supp. 2d at 185-

86; procedures for correspondence between counsel and their clients, *id.* at 186-88; materials

brought into and out of client meetings, *id.* at 188-89; classification review of client communica-

tions, *id.* at 189-90; telephonic access to clients, *id.* at 190; counsel's handling and dissemination of information from detainees, *id.* at 190-91; and security procedures at Guantánamo, *id.* at 191. These restrictions are onerous. Absent these procedures, however, the government could impose even more onerous restrictions, including prohibiting counsel visits, and even claim authority to terminate Petitioners' legal representation altogether.

### E.    The District Court's Decision

On January 30, 2005, Judge Green issued a decision denying in part the government's motion to dismiss, ruling that Petitioners had rights under the Due Process Clause and, subject to certain limitations, under the Geneva Conventions, and could maintain habeas actions claiming that the United States was detaining them in violations of such rights. *In re Guantanamo Detainee Cases*, 355 F. Supp. 2d 443, 481 (D.D.C. 2005).

### F.    The Unredacted Returns Order

On January 31, 2005, Judge Green also granted a motion by Petitioners requiring the government to provide counsel with unredacted versions of the factual returns. The government had resisted providing some of the classified information in the returns on the ground that the information was not "suitable" for disclosure to counsel, but after reviewing the material in camera, Judge Green ruled that the information at issue was relevant to Petitioners' defense and ordered the government to provide it to counsel. *In re Guantanamo Detainee Cases*, No. 02-CV-0299 *et al.*, slip op. at *2 (D.D.C. Jan. 31, 2005) (attached as Exhibit C). On February 3, 2005, Judge Green granted the government's motion to certify her decision for interlocutory review under 28 U.S.C. § 1292(b) and to stay Petitioners' habeas actions pending such review. The government thereupon appealed. *Al Odah v. United States*, No. 05-5064 (D.C. Cir. filed Mar. 7, 2005).

G.    **The 30-Day Notice Order**

Following Judge Green's decision denying the government's motion to dismiss, many other habeas actions were commenced by or on behalf of Guantánamo detainees, and the District Court also stayed those actions pending interlocutory review. Notwithstanding the stay, the District Court required the government to permit counsel to continue to meet with their clients and otherwise prepare their clients' cases, subject to the terms of the protective order.

In an early meeting at Guantánamo, one of the Petitioners told counsel that he had been warned that, if he did not cooperate with his interrogators, he would be transferred to a third country, where he would be tortured. On March 11, 2005, on reading newspaper reports of impending transfers of large numbers of detainees from Guantánamo, counsel applied *ex parte* to District Court's weekend emergency motions judge for a temporary restraining order. Counsel argued that such an order should be granted because any such transfer might result in extreme physical and mental suffering for the detainee and might, at least as a practical matter, defeat the District Court's jurisdiction over the detainee's habeas action. To avoid such human and legal injuries, counsel requested a temporary restraining order requiring the government to provide counsel with at least 30 days' advance notice of any intended transfer of certain Petitioners from Guantánamo, thereby providing counsel with an opportunity to challenge the intended transfer.

On March 12, 2005, the motions judge granted the TRO motion, and on March 29, 2005, the District Court issued a preliminary injunction providing the requested relief. *Abdah v. Bush*, Civ. No. 04-1254 (HHK) (RMC), 2005 WL 589812 (D.D.C. Mar. 12, 2005) (TRO) (attached as Exhibit D); *Abdah*, No. 04-1254 (HHK), 2005 WL 711814 (D.D.C. Mar. 29, 2005) (preliminary injunction) (attached as Exhibit E). The District Court issued orders in substance providing similar relief in dozens of other habeas actions. The government appealed all such orders. *Abdah v.*

*Bush*, Case No. 05-5224 (D.C. Cir. filed Jun. 16, 2005); *Al Ginco v. Bush*, No. 06-5191 (D.C. Cir. filed Jun. 30, 2006).

### H.    Subsequent Proceedings

On February 20, 2007, the Court of Appeals vacated Judge Green's order denying the government's motion to dismiss. *Boumediene I*, 476 F.3d at 994. The court held that the Military Commissions Act of 2006 ("MCA"), Pub. Law No. 109-366, 120 Stat. 2600, divested federal courts of jurisdiction over habeas actions brought by Guantánamo detainees, and that Petitioners had no legal rights enforceable through habeas because Guantánamo is not sovereign United States territory. *Id.* at 986-994. On April 2, 2007, this Court denied a petition for certiorari seeking review of the decision of the Court of Appeals. *Boumediene II*, 127 S. Ct. 1478. The Court of Appeals is poised to issue the mandate, directing the District Court to dismiss Petitioners' habeas actions, whereupon the District Court's protective order, unredacted returns order, and 30-day notice order will lapse. The District Court will dismiss – indeed, has already begun to dismiss – habeas actions brought by other Guantánamo detainees, likely causing the orders in those actions to lapse as well.

### ARGUMENT

The Court or a Justice may stay the mandate of the Court of Appeals to enable Petitioners to obtain a writ of certiorari from the Supreme Court. 28 U.S.C. § 2101(f); 28 U.S.C. § 1651(a). Justice Scalia has stated the standard for such relief:

> The practice of the Justices has settled upon three conditions that must be met before issuance of a § 2101(f) stay is appropriate. There must be a reasonable probability that certiorari will be granted (or probable jurisdiction noted), a significant possibility that the judgment below will be reversed, and a likelihood of irreparable harm (assuming the correctness of the applicant's position) if the judgment is not stayed.
>
> * * *

The conditions that are *necessary* for issuance of a stay are not necessarily *sufficient*. Even when they all exist, sound equitable discretion will deny the stay when 'a decided balance of convenience' does not support it.

*Barnes v. E-Systems, Inc. Group Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1302, 1304-05 (1991) (Scalia, J., Circuit Justice) (citations omitted), *cited in Stroup v. Willcox*, 127 S. Ct. 851 (2006) (Roberts, C.J., Circuit Justice); *see also United States Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 481 U.S. 1301, 1302 (1986) (Rehnquist, C.J., Circuit Justice); *Curry v. Baker*, 479 U.S. 1301, 1302 (1986) (Powell, J., Circuit Justice).

Applicants meet this standard. First, there is at least a "reasonable probability" that the Court will vote to grant rehearing after Petitioners have exhausted their DTA remedies. The three Justices who dissented from the denial of certiorari were of the view that the jurisdictional and constitutional questions raised by the petitioners "deserve this Court's immediate attention." *Boumediene II*, 127 S. Ct. at 1479 (Breyer, J., joined by Souter & Ginsburg, JJ., dissenting). Two other Justices stated that despite "the obvious importance of the issues raised in these cases," review was not appropriate "at this time" because the petitioners had yet to exhaust their DTA remedies. *See id.* at 1478 (statement of Stevens and Kennedy, JJ., respecting the denial of certiorari).

Second, there is a "significant possibility" that the judgment of the Court of Appeals in this matter will be reversed. Justice Breyer, dissenting from the denial of certiorari, expressed the view that "petitioners plausibly argue that the lower court's reasoning is contrary to this Court's precedent." *Id.* at 1479. Justice Kennedy in *Rasul* has rejected the government's formalistic distinction between sovereign United States territory and territory that "is in every practical respect a United States territory," 542 U.S. at 487 (Kennedy, J., concurring in judgment), and Justice Kennedy also made clear in *Verdugo* his view that whether foreign nationals outside sovereign United States territory have constitutional rights may depend on the right being asserted.

11

*United States v. Verdugo-Urquidez*, 494 U.S. 259, 275-78 (1990) (Kennedy, J., concurring).  Finally, Justice Stevens wrote the opinion of the Court in *Rasul*, concluding, among other things, that "petitioners' allegations unquestionably describe 'custody in violation of the Constitution or laws or treaties of the United States,'" 542 U.S. at 484 n.15 (citing Justice Kennedy's concurrence in *Verdugo*), and remanding for the District Court to "consider . . . the merits of petitioners' claims," *id.* at 484.

Third, Petitioners will be irreparably harmed if the Court of Appeals issues the mandate directing the District Court to dismiss these habeas cases for lack of jurisdiction.  If the mandate issues and Petitioners' habeas actions are dismissed, the protective order and other procedures established by the District Court will lapse, causing a procedural vacuum that will last at least until the Court of Appeals adopts procedures to govern DTA actions.  As discussed, these orders govern such matters as (1) communications between detainees and their counsel, (2) meetings of detainees and counsel, (3) counsel access to and handling of classified and protected information, including information vital to counsel's representation of the detainees, (4) contemplated transfers of detainees from Guantánamo, and (5) preservation of counsel papers and government records.  If these orders are allowed to lapse, the government, which maintains that Guantánamo detainees have no legal rights whatsoever, will have unfettered control over the matters just described.  In addition, by filing DTA actions in the Court of Appeals after the District Court has dismissed their habeas actions for want of jurisdiction, Petitioners may lose their opportunity to argue that jurisdiction *in these cases* remains because the MCA violates the Suspension Clause.  Petitioners, however, are entitled to ask the Court to reverse the Court of Appeals' jurisdictional holding in *these* cases, once Applicants have exhausted their DTA remedies.

Staying the mandate of the Court of Appeals is also warranted to facilitate the Court's swift intervention before Petitioners have exhausted their DTA remedies if the remedies are reasonably protracted or delayed. As Justices Stevens and Kennedy stated:

> If petitioners later seek to establish that the Government has unreasonably delayed proceedings under the Detainee Treatment Act of 2005, Tit. X, 119 Stat. 2739, or some other and ongoing injury, alternative means exist for us to consider our jurisdiction over the allegations made by petitioners before the Court of Appeals. See 28 U.S.C. §§ 1651(a), 2241. Were the Government to take additional steps to prejudice the position of petitioners in seeking review in this Court, "courts of competent jurisdiction," including this Court, "should act promptly to ensure that the office and purposes of the writ of habeas corpus are not compromised."

*Boumediene II*, 127 S. Ct. at 1478 (statement respecting the denial of certiorari).

Fourth, "a decided balance of convenience" supports a stay. The government will suffer no prejudice if the mandate issues. In opposing Petitioners' motion to stay the mandate in the Court of Appeals, the government suggested that, should a stay issue, Petitioners might attempt to continue to litigate these cases in the district court while exhausting their DTA remedies in this Court. Resps.' Opp. to Pet'rs. Mot. to Withhold Issuance of the Mandate, *Abdah v. Bush*, Nos. 05-5115 and 05-5116, at 6 (D.C. Cir. filed Apr. 11, 2007). That suggestion is groundless because the habeas actions are stayed. The government conjured other horribles in its opposition but never explained how any of them would follow from staying the mandate. *Id.* at 1, 5. As in *Barnes*, the "likelihood that denying the stay will permit irreparable harm to the applicant [would] clearly exceed the likelihood that granting it will cause irreparable harm to others," 501 U.S. at 1305 (concluding that the "balancing seems to me quite easy in the present case, since I am aware of no irreparable harm that granting the stay would produce").

Finally, the importance of the constitutional issues raised in *Boumediene I* militates in favor of a stay of the Court of Appeals' mandate. Justices sitting in chambers commonly emphasize the importance of the constitutional issues at stake in their decisions to issue stays pending

petitions for certiorari. *See, e.g.*, *California v. Riegler*, 449 U.S. 1319, 1322 (1981) (Rehnquist, J., Circuit Justice) ("In my opinion, the case presents issues which are of sufficient importance that four Justices of this Court would likely vote to grant the State's petition for certiorari."); *Boston v. Anderson*, 439 U.S. 1389, 1391 (1978) (Brennan, J., Circuit Justice) ("I am also of the view that at least four Members of this Court will vote to grant plenary review of this important constitutional question.").

## CONCLUSION

The application should be granted.

Respectfully submitted,

*David H. Remes*

_____
David H. Remes
Covington & Burling LLP
1201 Pennsylvania Avenue, N.W.,
Washington, D.C.  20004
(202) 662-5212

Attorneys for Petitioners

# EXHIBIT A

"Llenza, Shannon, Ms, DoD OGC" <llenzas@dodgc.osd.mil>

04/13/2007 04:30 PM
To
      Sarah Jackel/PaulWeiss@PAULWEISS, "Llenza, Shannon, Ms, DoD OGC"
<llenzas@dodgc.osd.mil> cc
      Jana Ramsey/PaulWeiss@PaulWeiss
Subject
      RE: Paul Weiss Trip Approval

Sarah,

We are approving your visit request provided the District Court PO
remains extant.

Thank you,

Shannon A. Llenza
Office of General Counsel, Legal Counsel
Department of Defense
(703) 571-9355 (DSN 671)
(703) 614-6745 (fax)

CAUTION: Information contained in this message may be protected by the
attorney/client, attorney work product, deliberative process or other
privileges. Do not disseminate further without approval from the Office
of the DoD General Counsel.
(703) 614-6745 (fax)

This message is intended only for the use of the Addressee and may
contain information that is privileged and confidential. If you are not
the intended recipient, you are hereby notified that any dissemination
of this communication is strictly prohibited. If you have received this
communication in error, please erase all copies of the message and its
attachments and notify us immediately.

**"Llenza, Shannon, Ms, DoD OGC" <llenzas@dodgc.osd.mil>**

04/13/2007 04:32 PM

To "Llenza, Shannon, Ms, DoD OGC" <llenzas@dodgc.osd.mil>, 'Caridad Feria-Perez' <Caridad_Feria-Perez@fd.org>

cc

Subject RE: Travel to GTMO

Caridad,

We are approving Paul Rashkind's visit request provided the District Court
PO remains extant.

Thank you,

Shannon A. Llenza
Office of General Counsel, Legal Counsel
Department of Defense
(703) 571-9355 (DSN 671)
(703) 614-6745 (fax)

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

**MAHMOAD ABDAH, et al.,**

**Petitioners,**

v.

**GEORGE W. BUSH, et al.,**

**Respondents.**

Civil Action 04-1254 (HHK)

---

### ORDER

On January 10, 2005, petitioners filed a Motion for Leave to Take Discovery and For Preservation Order [#96]. On February 3, 2005, the court (Green, J.) ordered that the proceedings in this and ten other coordinated cases be "stayed for all purposes pending resolution of all appeals in this matter." To the extent that petitioners seek to take discovery, their motion must be stayed in accordance with Judge Green's order.

Petitioners also seek a preservation order, which they argue is necessary to ensure that the government will maintain "the very sensitive evidence it now possesses about the torture, mistreatment, and abuse of the detainees now at Guantánamo." Pet'rs' Mot. for Disc./Protective Order at 8-9. Respondents counter that petitioners have failed to satisfy the four-part preliminary injunction standard, which they assert is required for entry of a protective order; that petitioners have not identified specific documents at risk for destruction; and that respondents are "well aware of their obligation not to destroy evidence that may be relevant in pending litigation." Resp'ts' Opp'n at 25.

While preservation orders take the form of an injunction, in that they order a party to perform or refrain from performing an act, petitioners need not meet the four-part preliminary injunction test in order to protect relevant documents from destruction. In fact, "a document preservation order is

no more an injunction than an order requiring a party to identify witnesses or to produce documents in discovery." *Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 138 n.8 (Fed. Cl. 2004) (citing *Mercer v. Magnant*, 40 F.3d 893, 896 (7th Cir. 1994)); *see also Ditlow v. Shultz*, 517 F.2d 166, 173-74, n.31 (D.C. Cir. 1975) (preservation order issued when moving party presented "sufficiently substantial" challenge on the merits, non-moving party agreed to maintain documents at issue, and preservation of documents presented only a "limited housekeeping burden").

Furthermore, in this case, all of the documents relevant to the adjudication of petitioners' claims, along with petitioner-detainees themselves, are in the sole custody and control of respondents. In addition, petitioners' counsel's access to their clients is quite restricted. It is almost inconceivable that within these confines, petitioners could identify specific instances of document destruction. Rather, the court finds entry of a preservation order appropriate in light of the purpose animating Judge Green's February 3, 2005 stay order, namely to preserve the status quo pending resolution of appeals. Finally, because respondents represent that they will not destroy the information at issue, a preservation order will not impose any harm or prejudice upon them. *See Al-Marri v. Bush*, No. 04-2035 (D.D.C. March 7, 2005) (preservation order). Accordingly, it is this 10th day of June, 2005, hereby

**ORDERED**, that petitioners' motion is **STAYED** insofar as petitioners seek discovery and **GRANTED** insofar as they seek a preservation order; and it is further

**ORDERED**, that respondents shall preserve and maintain all evidence and information regarding the torture, mistreatment, and abuse of detainees now at the United States Naval Base at Guantánamo Bay, Cuba.


Henry H. Kennedy, Jr.
United States District Judge

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                                )
JAMIL EL-BANNA et al.,          )
                                )
       Petitioners,             )
                                )
v.                              )      Civil Action No. 04-1144 (RWR)
                                )
GEORGE W. BUSH et al.,          )
                                )
       Respondents.             )
_____)
                                )
HANI SALEH RASHID ABDULLAH      )
  et al.,                       )
                                )
       Petitioners,             )
                                )
v.                              )      Civil Action No. 05-23 (RWR)
                                )
GEORGE W. BUSH et al.,          )
                                )
       Respondents.             )
_____)
```

### MEMORANDUM OPINION AND ORDER

Petitioners in each of the above-captioned habeas corpus
proceedings -- foreign nationals detained at Guantanamo Bay in
the custody of the United States, or their next friends -- seek
an order directing respondents to "preserve and maintain all
evidence, documents, and information regarding the torture,
mistreatment, and abuse of detainees now at the Guantanamo Bay
detention facility, and to preserve and maintain all evidence,
documents and information relating or referring to Petitioners."

-2-

(Mot. for Preservation Order.)[1]  Respondents oppose each motion,

arguing that the requested order is superfluous in light of their

well-understood preservation obligations, yet also overbroad and

burdensome.  (Opp'n at 5, 7.)[2]  Because a preservation order can

be appropriate in a habeas corpus proceeding, but is only

partially warranted here, petitioners' motions will be granted in

part and denied in part.

Respondents argue that because they are well aware of their

preservation obligations, to "'supplement every complaint with an

order requiring compliance with the Rules of Civil Procedure

would be a superfluous and wasteful task, and would likely create

no more incentive upon the parties than already exists.'"  (Opp'n

at 5, quoting Hester v. Bayer Corp., 206 F.R.D. 683, 685 (M.D.

Ala. 2001)).[3]  Respondents then conclude that petitioners'

_____

     [1]  El-Banna, Dkt. 145; Abdullah, Dkt. 30.

     [2]  El-Banna, Dkt. 147; Abdullah, Dkt. 32.

     [3]  The parties advocate different standards for preservation
orders, a dispute that need not be resolved here.  First, the
distinction between the standard articulated in Pueblo of Laguna
v. United States, 60 Fed. Cl. 133 (2004), urged by petitioners,
and the standard four-factor test employed in preliminary
injunction decisions, urged by respondents (see Opp'n at 3), may
be one without a practical difference.  See also, Hester, 206
F.R.D. at 685.  Second, respondents argue that a preservation
order must meet the test of a preliminary injunction (Opp'n at
3), but also concede that the Federal Rules of Civil Procedure
impose preservation obligations on civil litigants in every civil
action filed, automatically and without court review (Opp'n

-3-

requested order is both "overbroad and potentially burdensome to the extent that it goes beyond what might otherwise be permissible with respect to any discovery that might ever be appropriate in a habeas case." (Opp'n at 7, citing Harris v. Nelson, 394 U.S. 296, 300 (1969).)

The Supreme Court's opinion in Harris v. Nelson makes clear that the discovery provisions of the Federal Rules of Civil Procedure do not automatically apply in whole to federal habeas corpus proceedings. See 394 U.S. at 294 n. 5, 298-99. Therefore, the preservation obligations that flow to a litigant from the federal discovery rules cannot be presumed to apply to habeas litigants absent some express application by a court. Accordingly, a preservation order in habeas proceedings, particularly in proceedings such as these where there has been no full disclosure of the facts on the public record to authorize the challenged detention, is not superfluous or unnecessary.

Further, Harris v. Nelson also makes clear that a district court's authority to issue orders pursuant to 28 U.S.C. § 1651 in aid of its fact-finding obligations in habeas corpus proceedings is intended to be flexible and should be exercised as the circumstances require for a proper and just disposition.

―――――――――――

at 5), two positions in tension with each other.

-4-

[The Supreme Court has] held explicitly that the
purpose and function of the All Writs Act to supply the
courts with the instruments needed to perform their
duty [to issue orders appropriate to assist them in
conducting factual inquiries] . . . extend to habeas
corpus proceedings.

At any time in the [habeas corpus] proceedings, when
the court considers that it is necessary to do so in
order that a fair and meaningful evidentiary hearing
may be held so that the court may properly "dispose of
the matter as law and justice require," either on its
own motion or upon cause shown by the petitioner, it
may issue such writs and take or authorize such
proceedings with respect to development, before or in
conjunction with the hearing of the facts relevant to
the claims advanced by the parties, as may be
"necessary or appropriate in aid of [its jurisdiction]
. . . and agreeable to the usages and principles of
law." 28 U.S.C. § 1651.

. . . Obviously, in exercising this power, the court
may utilize familiar procedures, as appropriate,
whether these are found in the civil or criminal rules
or elsewhere in the "usages and principles of law."

394 U.S. at 299-300 (footnote omitted). The opinion in <u>Harris v.</u>

<u>Nelson</u> does not support respondents' suggestion that the

requested preservation order "goes beyond . . . any discovery

that might ever be appropriate in a habeas case." (Opp'n at 7.)[4]

_____

    [4] Respondents' statement, that "Petitioners' proposal
improperly, and without good cause, would put respondents in the
position of having to take action with respect to a wide range of
documents without having the opportunity to utilize the process
of objection and litigation available in the discovery context to
fine tune or challenge discovery requested based on, for example,
overbreadth, relevance, or burden" (Opp'n at 7), mistakenly
equates preservation obligations with production obligations and
erroneously presumes that respondents will have no opportunity to
litigate future discovery requests.

-5-

To the contrary, "the power of inquiry on federal habeas corpus is plenary" and its exercise depends entirely on the circumstances. Harris v. Nelson, 394 U.S. at 291.

Petitioners' filings challenge the fact and duration of their custody as being in violation of the Constitution or laws or treaties of the United States, matters that are cognizable under the general habeas statute. See Rasul v. Bush, 124 S.Ct. 2686, 2698 (2005) ("§ 2241 confers . . . jurisdiction to hear petitioners' habeas corpus challenges to the legality of their detention at the Guantanamo Bay Naval Base"); Chatman-Bey v. Thornburgh, 864 F.2d 804, 807 (D.C. Cir. 1988) (a prisoner's challenge to the date on which he was eligible to be considered for parole "falls comfortably within the broad reach of habeas corpus"). The petitions also raise other complaints for which habeas relief has not been foreclosed, namely, that certain conditions they face in detention constitute violations of specific provisions of the Constitution, laws or treaties of the United States. See Preiser v. Rodriguez, 411 U.S. 475, 499 (1973) ("When a [state] prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making the custody illegal.") (citation omitted); Johnson v. Avery, 393 U.S. 483 (1969) (removing restraint on the habeas

-6-

corpus petitioner's ability to assist fellow prisoners in writ-writing). The preservation order requested is tailored to preserve "documents and information in . . . [respondents'] possession" that may be "relevant to litigation or potential litigation or are reasonably calculated to lead to the discovery of admissible evidence." Wm. T. Thompson Co. v. General Nutrition Corp., 593 F. Supp. 1443, 1455 (C.D. Cal. 1984). Documents evidencing treatment of detainees -- whether statements of official policy, cumulative evidence of specific practices, or something else -- may be probative of the treatment of petitioners or may lead to other probative evidence. The requested order imposes no greater obligation on respondents than the federal discovery rules' preservation obligations impose on a litigant in a typical civil lawsuit. Respondents' contrary view of the requested order (Opp'n at 7) may underscore the need for a preservation order.

However, since the very preservation order sought by petitioners for all materials regarding treatment of all Guantanamo Bay detainees has already been issued against the same respondents in Al-Marri v. Bush, Civ. No. 04-2035 (D.D.C. Mar. 7, 2005) (Order), and Abdah v. Bush, Civ. No. 04-1254 (D.D.C. June 10, 2005) (Order), respondents here are already under a duty to

-7-

preserve those records and another preservation order would be
unnecessary.  Accordingly, it is hereby

ORDERED that petitioners' motions, insofar as they seek
preservation orders governing evidence, documents, and
information regarding the torture, mistreatment and/or abuse of
detainees held at the Guantanamo Bay detention facility be, and
hereby are, DENIED without prejudice as moot.  It is further

ORDERED that petitioners' motions otherwise be, and hereby
are, GRANTED.  Respondents shall preserve and maintain all
evidence, documents and information, without limitation, now or
ever in respondents' possession, custody or control, regarding
the individual detained petitioners in these cases.

SIGNED this 18th day of July, 2005.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge

# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| | ) | **Civil Action Nos.** |
| | ) | **02-CV-0299 (CKK), 02-CV-0828 (CKK),** |
| | ) | **02-CV-1130 (CKK), 04-CV-1135 (ESH),** |
| | ) | **04-CV-1136 (JDB), 04-CV-1137 (RMC),** |
| *In re* **Guantanamo Detainee Cases** | ) | **04-CV-1144 (RWR), 04-CV-1164 (RBW)** |
| | ) | **04-CV-1194 (HHK), 04-CV-1227 (RBW),** |
| | ) | **04-CV-1254 (HHK)** |
| | ) | |
| | ) | |

**ORDER GRANTING NOVEMBER 8, 2004 MOTION TO DESIGNATE "PROTECTED INFORMATION" AND GRANTING NOVEMBER 18, 2004 MOTION FOR ACCESS TO UNREDACTED FACTUAL RETURNS**

On November 8, 2004, counsel for the respondents filed a motion to designate as "protected information" all unclassified material contained in the respondents' factual returns to the petitions for writ of habeas corpus that was not filed in the public record. Counsel for the petitioners stated they were unable to take a position on the motion until they had an opportunity to review the specific information the respondents sought to have deemed "protected." In a related matter, counsel for petitioners filed a motion on November 18, 2004 seeking access to the full classified factual returns that respondents had submitted to the Court for *in camera* review. Counsel for the petitioners noted that the classified factual returns that were provided to them for review at the secure facility contained redactions of classified information that had been fully disclosed to the Court. Probably because of an oversight, that motion, although signed by counsel for the petitioners in multiple cases and containing the same caption as the one at the top of this Order, was not actually docketed in each case. The Court, however, is treating the motion as if it had been properly docketed in each of the above-captioned cases.

To enable both counsel for the petitioners and the Court to more easily determine the exact nature of the information respondents sought to be deemed "protected," the Court issued an Order on December 8, 2004 requiring the respondents to file factual returns with colored highlighting revealing the specific information they want to be declared "protected." The Order also required the respondents to highlight in a different color on the Court's factual returns the classified information they want to withhold from counsel for the petitioners. The respondents complied with the Order by filing with the Court new classified factual returns highlighting in blue the information they want "protected" and in pink the information they want to withhold from counsel for the petitioners. Counsel for the petitioners did not file any objections to designating all information highlighted in blue as "protected."

The Court finds the respondents' request to declare the information highlighted in blue as "protected" to be reasonable and, accordingly, will grant the respondents' motion. The Court also finds, however, that the classified information highlighted in pink and not disclosed to counsel for the petitioners is relevant to the merits of this litigation and that counsel for the petitioners are entitled to have access to that information as long as they comply with the procedures in the Court's November 8, 2004 Amended Protective Order.

Accordingly, it is hereby

ORDERED that the respondents' November 8, 2004 Motion to Designate as "Protected Information" Unclassified Information in Factual Returns to Petitions for Writ of Habeas Corpus That is Not Filed on the Public Record is GRANTED. It is

FURTHER ORDERED that the petitioners' November 18, 2004 Motion for Access to Unredacted Factual Returns is GRANTED.

2

Counsel for the petitioners are reminded that they must separately docket in each individual case motions that relate to multiple cases.

IT IS SO ORDERED.

January 31, 2005                                    _____/s/_____
                                                   JOYCE HENS GREEN
                                                   United States District Judge

# EXHIBIT D

Westlaw.

Not Reported in F.Supp.2d                                        Page 1
Not Reported in F.Supp.2d, 2005 WL 589812 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Abdah v. Bush
D.D.C.,2005.
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.
Mahmoad ABDAH, et al., Petitioners,
v.
George W. BUSH, et al., Respondents.
**No. CIVA041254(HHK)(RMC).**

March 12, 2005.

David H. Remes, Covington & Burling, Washington,
DC, Marc D. Falkoff, Covington & Burling, New
York, NY, for Petitioners.
Lisa Ann Olson, Preeya M. Noronha, Robert J.
Katerberg, Terry Marcus Henry, U.S. Department of
Justice, Washington, DC, for Respondents.
Charles B. Gittings, Jr., Pro Se, Manson, WA.

MEMORANDUM OPINION
COLLYER, J.
*1 Thirteen Yemeni nationals, designated as "enemy
combatants" at the Guantanamo Bay Naval Base
("GTMO") in Cuba, petition for a temporary
restraining order ("TRO") to prevent their removal
from GTMO and rendition to the custody of another
government. They argue that such removal and
rendition could have the effect of denying them
access to U.S. courts for review of their detainment
status and also potentially expose them to
interrogation techniques and treatment that would be
contrary to the laws of the United States.

Prior to their application for a TRO, the Petitioners
had sought a preliminary injunction that would
require the Government to give Petitioners' counsel
30-days notice of any such transfer. That matter is set
for hearing before Judge Henry Kennedy on March
24, 2005.[FN1] In the meantime, the *New York Times*
ran a story on March 11, 2005, describing a proposal
by the Pentagon and Secretary of Defense Donald
Rumsfeld to transfer more than half of the GTMO
detainees to prisons in Saudi Arabia, Afghanistan,
and Yemen.[FN2] Petitioners' counsel also learned from
co-counsel at the Center for Constitutional Rights,
"citing information from a person, who, for
professional reasons, refuses to make her sources
public-that the government intends to transfer many
detainees very quickly." Petitioners' *Ex Parte* Motion

for Temporary Restraining Order to Prevent
Respondents From Removing Petitioners From
Guantanamo Until Petitioners' Motion for
Preliminary Injunction Is Decided ("Pets.' Motion"),
Declaration of Marc D. Falkoff ("Falkoff Decl.") ¶
3. Petitioners seek an *ex parte* TRO "because they are
apprehensive that a public filing will provoke
respondents to initiate the exact dark-of-night
transfers that petitioners seek to prevent." Pets.'
Motion at 2.

FN1. The petition for a TRO is before the
undersigned as the emergency motions
judge for the weekend. It was filed in a
manner consistent with secret documents in
these cases at approximately 10:30 p.m. on
Friday evening, March 11, 2005. Because
the motion was filed on a Friday night *ex
parte,* and because some of the materials
appended to the motion are classified
"Secret," the Court has not had the benefit
of an opposition to the petition for a TRO or
even argument from Petitioners' counsel,
there being no available court reporter with
clearance. Its decision here is clearly limited
by those circumstances. The Court
concludes that it can enter this memorandum
opinion and order because it bases its
analysis largely on the Government's
arguments and factual proffer before Judge
Kennedy.

FN2. *See* Pets.' Motion, Exh. C (Douglas
Jehl, *Pentagon Seeks to Transfer More
Detainees from Base in Cuba, The New York
Times* (March 11, 2003)).

BACKGROUND

The Petitioners' underlying case is one of many
*habeas corpus* petitions filed in the District Court for
the District of Columbia on behalf of GTMO
detainees after the Supreme Court in *Rasul v. Bush*
held that "the federal courts have jurisdiction to
determine the legality of the Executive's potentially
indefinite detention of individuals who claim to be
wholly innocent of wrongdoing." --- U.S. ----, ----,
124 S.Ct. 2686, 2699, 159 L.Ed.2d 548 (2004). The
Government filed motions to dismiss or for judgment
as a matter of law in opposition to many of these

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 589812 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d)

habeas petitions. Judge Joyce Hens Green, who had been designated to decide common issues of law and fact in eleven of these cases, granted the motion in part and denied it in part.[FN3] In a separate case, Judge Richard Leon granted the motion in its entirety.[FN4] The cases before Judges Green and Leon have been fully briefed in the D.C. Circuit Court of Appeals and are under submission.

> FN3. _In re Guantanamo Detainee Cases,_ 2005 WL 195356 (D.D.C. Jan.31, 2005), _appeal docketed,_ No. 05-8003 (D.C.Cir. ___).
>
> FN4. _Khalid v. Bush,_ 2005 WL 100924 (D.D.C. Jan.19, 2005), _appeal docketed,_ No. 05-5063 (D.C.Cir. ___).

Fearful that the Government would transfer the detainees to other countries to avoid further adverse court rulings, the Petitioners have sought a preliminary injunction from Judge Kennedy to require 30-days prior notice of any such transfer. The Government filed its opposition to that petition on March 8, 2005 and described in detail the nature of its process for considering transfer of GTMO detainees. While that process involves high-level contacts between the U.S. Department of State and a foreign government, as well as consideration of a detainee's status by the U.S. Department of Defense, it does not contemplate any coordination or notice to the courts, where constitutional issues are being litigated, or notice to the detainees' counsel.

LEGAL STANDARDS

*2 A TRO may be granted "without written or oral notice to the adverse party or that party's attorney only if (1) it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition...." Fed. R. Civ. P. 65(b). The purpose of a TRO is to preserve the status quo and prevent irreparable harm until a hearing can be held. _See Granny Goose Foods, Inc. v. Bhd. of Teamsters,_ 415 U.S. 423, 439, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974).

In considering a request for a TRO, the court must examine whether: "(1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by an injunction." _Davenport v. Int'l Bhd. of Teamsters, AFL-CIO,_ 166 F.3d 356, 360 (D.C.Cir.1999). These factors interrelate on a sliding scale and must be balanced against each other. _Id. at 361._ A strong showing on one factor can outbalance a weaker showing on another.

Where the balance of hardships tips decidedly toward the movant, it will " 'ordinarily be enough that the [movant] has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation.' " _Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,_ 559 F.2d 841, 844 (D.C.Cir.1977) (citation omitted). "An order maintaining the status quo is appropriate when a serious legal question is presented, when little if any harm will befall other interested persons or the public and when denial of the order would inflict irreparable injury on the movant. There is substantial equity, and need for judicial protection, whether or not movant has shown a mathematical probability of success." _Id. at 844._

ANALYSIS

The analysis here needs to define the rights at issue. Petitioners have a pending motion for a preliminary injunction ("PI") to obtain prior notice before they may be transferred to a foreign country for continued detention and, perhaps, interrogation by techniques that may be contrary to the laws of this country. Their motion for a PI, in turn, is designed to protect the Petitioners' rights to have the lawfulness of their current detention at GTMO ruled on by the Court of Appeals.

As defined by the Supreme Court, " 'the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest.' " _Rasul,_ --- U.S. at ----, 124 S.Ct. at 2692 (quoting _INS v. St. Cyr,_ 533 U.S. 289, 301, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001)). "Executive imprisonment has been considered oppressive and lawless since John, at Runnymede, pledged that no free man should be imprisoned, dispossessed, outlawed, or exiled save by the judgment of his peers or by the law of the land." _Id._ (quoting _Shaughnessy v. United States ex. rel. Mezei,_ 345 U.S. 206, 218-219, 73 S.Ct. 625, 97 L.Ed. 956 (1953) (Jackson, J., dissenting)). The "law of the land" is interpreted and applied in this country by its

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                  Page 3
Not Reported in F.Supp.2d, 2005 WL 589812 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d)**

court systems.

**\*3** Detainees at GTMO may be transferred to the control of another government, generally to their country of citizenship, for release. Respondents' Memorandum in Opposition to Petitioners' Motion for Order Requiring Advance Notice of Any Repatriations or Transfers From Guantanamo ("U.S.Opp.") at 3; Declaration of Deputy Assistant Secretary of Defense for Detainee Affairs Matthew C. Waxman ("Waxman Decl.") ¶ 3; Declaration of Ambassador Pierre-Richard Prosper ("Prosper Decl.") ¶ 3. "The United States also transfers Guantanamo detainees, under appropriate conditions, to the control of other governments for investigation and possible prosecution and continued detention when those governments are willing to accept responsibility for ensuring, consistent with their laws, that the detainees will not pose a threat to the United States and its allies." U.S. Opp. at 3; *see also* Pets.' Motion, Exh. F.

The Petitioners have adequately shown that they could face continued detention at the request of the United States, or as a condition of their release from GTMO set by the United States, in any country to which they might be transferred even if, after the transfer, that foreign nation assumed full responsibility and control over their terms of incarceration and the United States fully relinquished such responsibility and control.

### A. Likelihood of Success on the Merits

*Habeas corpus* challenges the detention of the petitioner. The Government wants at least some of the GTMO detainees to remain in detention, even if transferred to the control of foreign nation. Once transferred, however, their *habeas* petitions would become moot because the courts in the United States would no longer have control over their warden.

The Government argues to Judge Kennedy, in its opposition to the Petitioners' request for a preliminary injunction, that "[t]here is no legal basis for judicial intervention in the processes by which enemy combatant detainees are repatriated or transferred, and any such interference would illegitimately encroach on the foreign relations and national security prerogatives of the Executive Branch." U.S. Opp. at 1. Obviously, the Petitioners' request for 30-days advance notice of any transfer is not at issue here and will not be decided. For purposes of the TRO, however, the Court finds that it would not be

necessary in any way to intrude into foreign relations or negotiations over repatriation or transfer. The Court need only assess whether removing the detainees from the jurisdiction of the Court-while insisting on their continued detention-is subject to a temporary injunction so that the legality of that detention *ab initio* can be determined and the trial judge can decide whether prior notice is appropriate. These issues are " 'so serious, substantial, difficult and doubtful" ' as to warrant maintaining the status quo "whether or not movant has shown a mathematical probability of success." *Washington Metro. Area Transit Comm'n*, 559 F.2d at 844 (citation omitted).

**\*4** There is no doubt that the district courts have jurisdiction over the Petitioners' *habeas corpus* petitions. *Rasul*, --- U.S. at ----, 124 S.Ct. at 2698. There is also no doubt that "the All Writs Act, 28 U.S.C. § 1651(a), empowers a district court to issue injunctions to protect its jurisdiction...." *SEC v. Vision Communications, Inc.*, 74 F.3d 287, 291 (D.C.Cir.1996). The Government resists this conclusion by arguing that Judge Green stayed these cases "for all purposes" and that there is no jurisdiction remaining in the district court. The Court disagrees.

The appeal from Judge Green's ruling is interlocutory; the rest of the case remains with Judge Kennedy and with the undersigned as the emergency motions judge. Because Judge Green's ruling was so fundamental to the very rights of these litigants in the federal courts-and because Judge Leon's ruling disagreed-Judge Green ordered an administrative stay to save time, money and judicial resources. Such a stay could not be read to also deprive the Petitioners of their rights to seek emergency assistance when faced with continued detention at the request of the United States but no venue in which to challenge its legality.

The Court expresses no opinion on the likelihood that Petitioners will succeed in their request for a 30-day notice prior to any transfer to a foreign country. Instead, it rules that the Petitioners have at least a fifty-fifty chance of prevailing on their constitutional claims before the Court of Appeals and that they raise serious arguments that require more deliberative consideration concerning whether removing them from the Court's jurisdiction, while insisting on continued detention, is within the province of the executive.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 589812 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

### B. *Irreparable Harm*

Were the Petitioners to be transferred to the control of a foreign country, they would effectively lose their rights to pursue their *habeas* claims in this country. The Court finds that their injury would be continued detention outside the jurisdiction of U.S. courts-courts that are actively reviewing the constitutionality of that very detention. While the Supreme Court has granted them a right of access to our court system, such a transfer would terminate that right, insofar as it sounds in *habeas corpus,* because U.S. courts would no longer have control over their warden. Presumably, the Petitioners would suffer no harm if the Government were to transfer them to Yemen for release; that is the goal of their *habeas* petitions. A transfer with continued indeterminate detention with no right of review or further court access poses a very different set of parameters. With or without the allegation of improper forms of interrogation in a foreign country, the Court concludes that a continuation of their detention without redress to assess its legality could constitute irreparable harm to the Petitioners.

Nonetheless, the Court pauses over whether the Petitioners have shown the immediacy of potential harm that justifies a TRO before the Government or its attorney could be heard. Fed. R. Civ. P. 65(b) (TRO may be granted without notice only if "it clearly appears from specific facts ... that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition."). The only evidence of immediacy here is third- or fourth-hand hearsay: co-counsel at the Center for Constitutional Rights told Petitioners' counsel that s/he was informed by an unnamed person that another unnamed source confided that the Government intends to transfer many detainees-who may or may not include any of the instant Petitioners-"very quickly." The reliability of such information cannot be ascertained. Yet the Government has already denied a request from counsel for the Petitioners that it informally agree to give advance notice of any transfer and it clearly regards such notice as an intrusion into the executive sphere of foreign relations. Consequently, the Petitioners state that they filed *ex parte* to avoid precipitating any hasty action by the Government to avoid addressing such transfers-and-continued-detention in a U.S. court.

**\*5** What is evident from the record is that the Pentagon and the State Department are working together to arrange for some numbers of unspecified GTMO detainees to be transferred to foreign nations and detained for uncertain periods. The Government refuses to give any advance notice of such transfers. Approximately 200 detainees have already been transferred, sixty-five of whom were sent abroad on the condition that they continue to be detained. Prosper Decl. ¶ 2. "Of those 65 detainees who have been transferred to the control of host governments, 29 were transferred to Pakistan, 9 to the United Kingdom, 7 to Russia, 5 to Morocco, 6 to France, 4 to Saudi Arabia, 1 to Denmark, 1 to Spain, 1 to Sweden, 1 to Kuwait, and 1 to Australia." *Id.* That this process continues is acknowledged by the United States. "Among the assurances sought in every transfer case in which continued detention by the government concerned is foreseen is the assurance of humane treatment...." *Id.* ¶ 6. Under these circumstances, the only way that anyone could know that a transfer is about to happen, *i.e.,* be "immediate," is if one is within the chain of command within the federal departments that consult on such matters or if there were information revealed *sotto voce* to a reporter. Based on the totality of the circumstances, the Court finds that the Petitioners face a risk of irreparable harm that is sufficiently immediate to warrant temporary relief.

### C. *Injury to the Government*

The Court can see no injury to the Government from granting a temporary injunction here. At most, this injunction will be alive for ten days unless both parties agree to its continuation or Judge Kennedy extends it another ten days. Nothing about this injunction will serve to prevent the Government's diplomatic and other efforts to arrange transfers of Guantanamo Bay detainees but it will ensure that a judicial officer reviews the Petitioners' rights to prior notice and/or retention in this jurisdiction before the Government actually carries out any such transfer.

### D. *Injury to the Public Interest*

The Court can see no injury to the public interest from granting a temporary injunction here.

### CONCLUSION

For the reasons stated, the *Ex Parte* Motion for a Temporary Restraining Order will be GRANTED. The Temporary Restraining Order accompanies this memorandum opinion.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2005 WL 589812 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d)**

D.D.C.,2005.
Abdah v. Bush
Not Reported in F.Supp.2d, 2005 WL 589812
(D.D.C.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E

Westlaw.

Not Reported in F.Supp.2d                                                                                                 Page 1
Not Reported in F.Supp.2d, 2005 WL 711814 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Abdah v. BushD.D.C.,2005.Only the Westlaw
citation is currently available.
United States District Court, District of Columbia.
Mahmoad ABDAH, et al., Petitioners,
v.
George W. BUSH, et al., Respondents.
**No. Civ.A. 04-1254(HHK).**

March 29, 2005.

David H. Remes, Covington & Burling, Washington,
DC, Marc D. Falkoff, Covington & Burling, New
York, NY, for Petitioners.
Lisa Ann Olson, Preeya M. Noronha, Robert J.
Katerberg, Terry Marcus Henry, U.S. Department of
Justice, Civil Division, Washington, DC, for
Respondents.

MEMORANDUM OPINION
KENNEDY, J.
**\*1** Petitioners are aliens who are being held by the
United States military at Guantánamo Bay Naval
Base in Cuba and who have petitioned this court for a
writ of habeas corpus. While the merits of their
individual claims have not yet been adjudicated, this
court (Green, J.) has determined that some of the
causes of action set forth in their habeas petition
survive Respondents' motion to dismiss. This ruling
is currently on appeal. Presently before the court is
Petitioners' motion for a preliminary injunction.
Asserting that Respondents have contemplated or are
contemplating transferring them to the custody of
foreign nations to be further detained and possibly
tortured, Petitioners seek an order from this court that
would require Respondents to provide their counsel
and this court with 30 days' advance notice of any
Petitioner's removal from Guantánamo. Upon
consideration of the briefing of the parties, the
submissions that accompany the briefing, and the
arguments of counsel at a hearing, the court
concludes that Petitioners' motion should be granted.

I. BACKGROUND

Petitioners are thirteen [FN1] Yemeni nationals who
each allegedly traveled to Pakistan for reasons
"unrelated to any activities of al Qaeda or the
Taliban," Pet. ¶ 19,[FN2] such as pursuing religious

studies, *id.* ¶¶ 26, 40, 43, 45, 47; obtaining medical
care, *id.* ¶ 33; and seeking better employment, *id.* ¶
36. All were "arrested by Pakistani police as part of a
dragnet seizure of Yemeni citizens." *Id.* ¶ 19. Details
of their capture and subsequent movements are hazy,
but Petitioners allege that they were seized in 2001 or
2002, *id.* ¶ 20, "far from the battlefield." *Id.* ¶ 61.
All were then transferred to United States military
custody and transported to the United States Naval
Base at Guantánamo Bay, Cuba ("Guantánamo"),
where they have since been held, "virtually
*incommunicado,*" *id.* ¶ 63, as "enemy combatants."
All Petitioners deny that they are enemy combatants
or that they have otherwise been "part of or
supporting forces hostile to the United States." *Id.* ¶
15.

> FN1. The court notes some inconsistency in
> the parties' briefing regarding the number of
> Petitioners included in this action. The
> petition for writ of habeas corpus lists
> *fourteen* individuals: (1) Mahmoad Abdah;
> (2) Majid Mahmoud Ahmed; (3)
> Abdulmalik Abdulwahab Al-Rahabi; (4)
> Makhtar Yahia Naji Al-Wrafie; (5) Aref
> Abd Il Rheem; (6) Yasein Khasem
> Mohammad Esmail; (7) Adnan Farhan
> Abdul Latif; (8) Jamal Mar'i; (9) Othman
> Abdulraheem Mohammad; (10) Adil Saeed
> El Haj Obaid; (11) Mohamed Mohamed
> Hassan Odaini; (12) Sadeq Mohammed
> Said; (13) Farouk Ali Ahmed Saif; and (14)
> Salman Yahaldi Hsan Mohammed Saud.
> Pet. ¶¶ 22-51 and caption.
> Petitioners' motion for a preliminary
> injunction identifies *thirteen* Petitioners,
> Pet'rs' Mot. at 2, while Respondents mention
> *twelve* detainees, stating they have no
> records corresponding to Aref Abd Il
> Rheem. Resp'ts' Opp'n at 2, n. 1.

> FN2. "Pet." refers to Petitioners' petition for
> writ of habeas corpus filed July 27, 2004.

On June 28, 2004, the Supreme Court determined
that "the federal courts have jurisdiction to determine
the legality of the Executive's potentially indefinite
detention of [the detainees at Guantánamo Bay] who
claim to be wholly innocent of wrongdoing." *Rasul v.
Bush,* --- U.S. ----, 124 S.Ct. 2686, 2699, 159 L.Ed.2d

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 711814 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d)

548 (2004). Shortly thereafter, the Department of Defense issued an order creating the Combatant Status Review Tribunal ("CSRT") to evaluate the status of each detainee at Guantánamo. *In re Gunatanamo Detainee Cases, 355 F.Supp.2d 443, 450 (D.D.C.2005), appeal docketed,* No. 05-8003 (D.C.Cir. Mar. 21, 2005). On July 27, 2004, Petitioners filed a petition for writ of habeas corpus, seeking to obtain "a judicial determination of whether there is a factual basis for Respondent's determination that they are 'enemy combatants,' " Pet. ¶ 14, and asserting that the government has "advanced no justification" for their "arrest, transportation and continued incarceration." *Id.* ¶ 16. Their petition was coordinated with ten other habeas cases filed by other Guantánamo detainees to allow Judge Joyce Hens Green, the designated judge, to resolve common issues of law and fact.

**\*2** On January 31, 2005, Judge Green issued a memorandum opinion and order granting in part and denying in part Respondents' motion to dismiss, finding that the detainees "have the fundamental right to due process of law under the Fifth Amendment," *In re Gunatanamo Detainee Cases, 355 F.Supp.2d at 463,* and that the CSRT proceedings failed to protect those due process rights. *Id.* at 468.

Subsequently, Judge Green issued an order certifying her opinion for interlocutory appeal and staying the proceedings in the eleven cases pending resolution of Respondents' appeal. Petitioners now contend that "Respondents have contemplated or are contemplating removal of some or all Petitioners from Guantánamo to foreign territories for torture or indefinite imprisonment without due process of law." Pet'rs' Mot. for Prelim. Inj. ("Pet'rs' Mot.") at 1. Fearing that any such transfer would "also circumvent[ ] Petitioners' right to adjudicate the legality of their detention," *id.* at 6, Petitioners seek a preliminary injunction requiring Respondents to provide Petitioners' counsel with 30 days' advance notice of "any intended removal of Petitioners from Guantanamo Bay Naval Base," *id.* at 1, to enable counsel to contest the removal if they deem it advisable to do so.

## II. ANALYSIS

### A. Stay of February 3, 2005

Respondents first argue that the stay order Judge Green issued in the eleven coordinated cases prevents this court from considering the merits of the present motion. This argument is unavailing.

On February 3, 2005, Judge Green issued an order in the eleven habeas cases that "stayed [the cases] for all purposes pending resolution of all appeals in this matter." *In re Guantanamo Detainee Cases,* No. 04-1254 (D.D.C. Feb. 3, 2005) (order). Courts have consistently recognized that a stay may be necessary preserve the status quo among the parties pending appeal. *See, e.g., Warm Springs Dam Task Force v. Gribble,* 417 U.S. 1301, 1310, 94 S.Ct. 2542, 41 L.Ed.2d 654 (1974); *United Mun. Distrib. Group v. FERC,* 732 F.2d 202, 205 (D.C.Cir.1984); *NLRB v. Sav-on Drugs, Inc.,* 704 F.2d 1147, 1149 (9th Cir.1983); *Metzler v. United States,* 832 F.Supp. 204, 208 (E.D.Mich.1993). Here, Petitioners are not asking the court to bypass the stay and resume adjudication of their underlying claims. Rather, they seek to prevent Respondents from unilaterally and silently taking actions that may render their claims moot; thus the injunctive relief Petitioners seek would ensure the very same result that the stay itself was entered to secure. *See Dist. 50, United Mine Workers of Am. v. Int'l Union, United Mine Workers of Am.,* 412 F.2d 165, 169 (D.C.Cir.1969). The stay order simply cannot be construed to prevent emergency relief consistent with maintenance of the status quo. *See Summit Med. Assocs., P.C. v. James,* 998 F.Supp. 1339, 1351 (M.D.Ala.1998); *Universal Marine Ins., Ltd. v. Beacon Ins. Co.,* 577 F.Supp. 829, 832 (W.D.N.C.1984). The court therefore proceeds to consider the merits of Petitioners' request.

### B. Legal Standard

**\*3** A preliminary injunction is an "extraordinary remedy" that should only issue "when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton,* 391 F.3d 251, 258 (D.C.Cir.2004) (citing *Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997)). A court considering a preliminary injunction request must examine four factors, namely whether: (1) Petitioners will be "irreparably harmed if an injunction is not granted"; (2) there is a "substantial likelihood" Petitioners will succeed on the merits; (3) an injunction will "substantially injure" Respondents; and (4) the public interest will be furthered by the injunction. *Serono Labs., Inc., v. Shalala,* 158 F.3d 1313, 1317-18 (D.C.Cir.1998). These four factors "interrelate on a sliding scale" and must be considered in relation to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 711814 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d)

one another, for " 'if the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak.' " *Id.* at 1318 (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C.Cir.1995)).

### C. Merits of the Preliminary Injunction Motion

#### 1. Irreparable Injury

The court gives special scrutiny to Petitioners' claims of injury, because "the basis of injunctive relief in the federal courts has always been irreparable harm." *CityFed Fin.*, 58 F.3d at 747 (quoting *Sampson v. Murray*, 415 U.S. 61, 88, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974)). To obtain preliminary injunctive relief, Petitioners must show that the injury threatening them is more than "remote and speculative." *Milk Indus. Found. v. Glickman*, 949 F.Supp. 882, 897 (D.D.C.1996). Petitioners unquestionably make such a showing.

Petitioners allege two irreparable injuries. With respect to the first, they claim that the Department of Defense is actively planning the transfer of detainees from Guantanamo to countries "for torture or indefinite imprisonment without due process of law," Pet'rs' Mot. at 1, and note that the United States has "repeatedly transferred detainees into the custody of foreign governments that employ inhumane interrogation techniques." *Id.* at 3. Respondents dispute these assertions, dismissing them as "sensationalistic allegations" based upon "hollow speculation" and "largely anonymous sources and innuendo" cited in newspaper and magazine articles, Resp'ts' Opp'n at 19, and statements from a single detainee. Respondents then describe the policy and procedures the United States employs regarding the transfer and repatriation of Guantánamo detainees, including the transfer of detainees to the control of other governments for investigation and possible prosecution. Respondents state that "a key concern is whether the foreign government will treat the detainee humanely and in a manner consistent with its international obligations," Resp'ts' Opp'n at 4, and that "it is the policy of the United States not to repatriate or transfer a detainee to a country where the United States believes it is more likely than not that the individual will be tortured." *Id.* Respondents also produce declarations from high-level Department of State and Department of Defense officials outlining the consultations and deliberations the agencies undertake prior to transferring a detainee,

and indicating that among 211 detainees the military has transferred out of Guantánamo to date, 65 were provided to foreign governments for ongoing detention. *Id.*, Prosper Decl. ¶ 2, Waxman Decl. ¶ 4.

**\*4** These declarations concerning general policy and practice, however, do not entirely refute Petitioners' claims or render them frivolous. The court has reviewed Petitioners' exhibits, and notes that in addition to citing anonymous sources, the submitted articles quote by name former Guantánamo detainees, former high-level officials from the United Kingdom and Pakistan, and current and former employees of the United States government who were themselves involved in transferring detainees. The court, however, need not determine whether Petitioners' fear of torture constitutes the requisite "irreparable injury" because their second claim of injury clearly satisfies the preliminary injunction standard.

Petitioners contend that if the United States military transfers Petitioners from Guantánamo to overseas custody, it would effectively extinguish those detainees' habeas claims by fiat. Such transfers would eliminate any opportunity for Petitioners to ever obtain a fair adjudication of their "fundamental right to test the legitimacy of [their] executive detention." *Lee v. Reno*, 15 F.Supp.2d 26, 32 (D.D.C.1998). The parties agree that upon transfer, the court will no longer retain jurisdiction to provide any relief Petitioners seek. Hr'g Tr. at 19:7-10; Resp'ts' Opp'n at 6 ("once transferred, a detainee is no longer subject to the control of the United States"), Waxman Decl. ¶ 5. While Respondents contest Judge Green's determination that Petitioners have legally cognizable due process claims properly before the court, pending their appeal they may not act to deprive this court of its jurisdiction over the very "corpus" of this case; indeed, the "federal courts may and should take such action as will defeat attempts to wrongfully deprive parties entitled to sue in the Federal courts for the protection of their rights in those tribunals." *Abu Ali v. Ashcroft*, 350 F.Supp.2d 28, 54 (D.D.C.2004) (quoting *Alabama Great S.R. Co. v. Thompson*, 200 U.S. 206, 218, 26 S.Ct. 161, 50 L.Ed. 441 (1906)).

#### 2. Likelihood of Success

Petitioners argue that they have properly invoked this court's jurisdiction and have stated actionable claims under the Due Process Clause of the Fifth Amendment and the Geneva Convention, thereby demonstrating a likelihood of success. Respondents urge instead that Petitioners fail to make the required

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 2005 WL 711814 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d)

showing "that they are likely to succeed in establishing a judicially enforceable entitlement to veto the same repatriation that they previously told the Court Respondents were required to conduct." [FN3] Resp'ts' Opp'n at 11 (emphasis omitted). Although the court would use somewhat different language to characterize the relevant standard, Respondents are correct that *if* there are no circumstances under which Petitioners could obtain a court order preventing a contemplated transfer, a preliminary injunction should not be granted. Respondents are wrong, however, in arguing that there are in fact no such circumstances present, and that consequently there is no legal basis for judicial involvement in transfer or repatriation decisions regarding Petitioners.

> FN3. This last contention is perplexing, because it seems beyond question that advocating for release into freedom is not equivalent to advocating for transfer from ongoing detention in one locale to ongoing detention in another.

*5 To the contrary, transfer of Petitioners without notice and leave of court is forbidden by Fed. R.App. P. 23(a), which requires that "pending review of a decision in a habeas corpus proceeding [FN4] commenced before a court ... the person having custody of the prisoner must not transfer custody to another unless a transfer is directed in accordance with this rule." The Rule "was designed to prevent prison officials from impeding a prisoner's attempt to obtain habeas corpus relief by physically removing the prisoner from the territorial jurisdiction of the court in which a habeas petition is pending." *Hammer v. Meachum,* 691 F.2d 958, 961 (10th Cir.1982) (citing *Jago v. United States Dist. Court,* 570 F.2d 618, 626 (6th Cir.1978), and *Goodman v. Keohane,* 663 F.2d 1044, 1047 (11th Cir.1981)). Respondents' contention that Rule 23(a) is not typically applied in situations involving the transfer of prisoners to the custody of foreign nations, Resp'ts' Br. in Resp. to Pet'rs' Notice of Supp. Auth. at 3, while correct, is of no moment. Its application here is consistent with both the text of the rule and its underlying purpose. Indeed, Rule 23(a) acquires an even greater importance in the context of Petitioners' case. When a prisoner with a pending habeas action is simply transferred from one state to another in violation of Rule 23(a), the transfer "does not divest [the court of its] jurisdiction over the action." *Reimnitz v. State's Attorney of Cook County,* 761 F.2d 405, 409 (7th Cir.1985). Here, though, Petitioners' transfer to another nation would assuredly deprive the court of

its jurisdiction. Petitioners thus demonstrate that they have a clear likelihood of success in blocking a transfer made absent notice to, and approval from, the court.

> FN4. Jurisdiction over a petition for a writ of habeas corpus is determined when the petition is filed. *Barden v. Keohane,* 921 F.2d 476, 477 n. 1 (3d Cir.1990) (citing accordance with *Ross v. Mebane,* 536 F.2d 1199 (7th Cir.1976) (per curiam); *Harris v. Ciccone,* 417 F.2d 479 (8th Cir.1969), *cert. denied,* 397 U.S. 1078, 90 S.Ct. 1528, 25 L.Ed.2d 813 (1970)).

Respondents further argue against the application of Rule 23(a) by referring to a footnote in *Rasul,* which remarked that after the Supreme Court granted certiorari, two petitioners in that case, Shafiq Rasul and Asif Iqbal, were "released from custody." *Rasul,* --- U.S. ----, ---- n. 1, 124 S.Ct. 2686, 2691 n. 1, 159 L.Ed.2d 548. Respondents argue that this reference demonstrates that the Supreme Court "did not give any hint of perceiving any violation" of the Supreme Court's equivalent to Rule 23(a). Resp'ts' Br. in Resp. to Pet'rs' Notice of Supp. Auth. at 4; *see also* Hr'g Tr. at 7:20-21. The court declines Respondents' invitation to make such an inference, both because there is no indication in *Rasul* whether the two named petitioners were transferred into foreign custody or released outright, and because neither party presented the issue to the Supreme Court.

3. Harm to Respondents

Respondents assert that granting Petitioners' motion would "illegitimately encroach on the foreign relations and national security prerogatives of the Executive Branch." Resp'ts' Opp'n at 1. They also argue that granting Petitioners' injunction request would harm the government in "myriad" other ways, by "undermining the United States Government's ability to investigative and resolve allegations of mistreatment or torture"; "undermin[ing] the United States' ability to reduce the numbers of individuals under U.S. control"; impairing the United States' coordination with other governments' efforts in the war on terrorism; and "encumber[ing] ... an already elaborate process leading up to transfers or repatriations." Resp'ts' Opp'n at 22. At the preliminary injunction hearing held on March 22, 2005, Respondents' counsel amplified these contentions, noting that the advance notice

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 5
Not Reported in F.Supp.2d, 2005 WL 711814 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d)**

requirement would "undermine[ ] the executive's ability to speak with one voice." Hr'g Tr. at 8:10-11. Beyond these vague premonitions, however, the court does not have any indication that notifying Petitioners' counsel 30 days ahead of planned transfers of their clients will intrude upon executive authority. The preliminary injunction Petitioners seek will not require, or even enable, the court to take the two *specific* actions which Respondents' declarants warn against: forcing State Department officials to "unilaterally ... disclose outside appropriate Executive branch channels its communications with a foreign government relating to particular mistreatment or torture concerns," Resp'ts' Opp'n, Prosper Decl. ¶ 10, and publicly disclosing the facts gathered and analyses prepared by various State Department offices, or bringing these findings "to the attention of officials and others in foreign States ..." *Id.* ¶ 11.

*6 In evaluating the alleged injury Respondents would suffer if the preliminary injunction is granted, the court balances the respective hardships imposed upon the parties. *See O'Donnell Constr. Co. v. District of Columbia,* 963 F.2d 420, 429 (D.C.Cir.1992); *George Washington Univ. v. District of Columbia,* 148 F.Supp.2d 15, 18-19 (D.D.C.2001). While the injunction Petitioners seek might restrict or delay Respondents with respect to one aspect of managing Petitioners' detention, such a consequence does not outweigh the imminent threat facing Petitioners with respect to the *entirety* of their claims before the court.[FN5]

FN5. Respondents' assertion that they are merely "relinquishing" custody of detainees whom the government is simply "no longer interested in detaining," Hr'g Tr. at 9:20-21, is disingenuous. According to Petitioners' allegations, unanswered by the United States, they have been held at Guantánamo for periods of several years, *see, e.g.,* Pet'rs' Mot., Exs. K, M, O, S. The government's invocation of sudden exigency requiring their transfer now cannot trump Petitioners' established due process rights to pursue their habeas action in federal court. *See Rasul,* --- U.S. at ---- - ----, 124 S.Ct. at 2698-99; *In re Guantanamo Detainee Cases,* 355 F.Supp.2d at 464 ("Of course, it would be far easier for the government to prosecute the war on terrorism if it could imprison all suspected 'enemy combatants' at Guantanamo Bay without having to

acknowledge and respect any constitutional rights of detainees. That, however, is not the relevant legal test ... constitutional limitations often, if not always, burden the abilities of government officials to serve their constituencies.").

4. Public Interest

Finally, the court looks to whether granting the preliminary injunction request implicates the public interest, and if so, whether it confers benefit or produces harm. Respondents simply conflate the public interest with their own position, noting that "the public interest and harm-to-non-movant factors converge." Resp'ts' Opp'n at 21. It is indisputable that the public interest favors vigorously pursuing terrorists and holding them to account for their actions. It is misleading, however, to frame the relevant interest here as the government's ability "to detain enemy combatants to prevent them from returning to the fight and continuing to wage war against the United States." Resp'ts' Opp'n at 21-22. Petitioners' current designation as enemy combatants is not a foregone conclusion; challenges to the accuracy and legitimacy of the government's determination that Petitioners have engaged in hostilities against the United States, or aided those who have, are the very core of Petitioners' underlying habeas claims. Respondents' assertion to the contrary, that "Petitioners' enemy combatant status was recently confirmed in Combatant Status Review Tribunals," Resp'ts' Opp'n at 2, ignores Judge Green's ruling that the CSRTs as so far implemented are constitutionally deficient. Instead, this factor tilts in Petitioners' favor, because the public has a strong interest in ensuring that its laws do not subject individuals to indefinite detention without due process; "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n,* 23 F.3d 1071, 1079 (6th Cir.1994).

D. All Writs Act

Petitioners also ask the court to exercise its authority under the All Writs Act, which provides in relevant part that "all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). The All Writs Act "empowers a district court to issue injunctions to protect its jurisdiction ...," *SEC v. Vision Communications, Inc.,* 74 F.3d 287, 291

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 6
Not Reported in F.Supp.2d, 2005 WL 711814 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d)**

(D.C.Cir.1996), and a court may grant a writ under the Act whenever it determines such action necessary "to achieve the ends of justice entrusted to it." *Adams v. United States,* 317 U.S. 269, 273, 63 S.Ct. 236, 87 L.Ed. 268 (1942). Were the court to find adequate "alternative remedies" unavailable, *Clinton v. Goldsmith,* 526 U.S. 529, 537, 119 S.Ct. 1538, 143 L.Ed.2d 720 (1999), or "the traditional requirements of an injunction" inapplicable, *Klay v. United Healthgroup, Inc.,* 376 F.3d 1092, 1101 n. 13 (11th Cir.2004), it could employ the Act to order the relief Petitioners seek. Because Petitioners have made a clear showing that a preliminary injunction is warranted under the familiar four-part test, though, the court need not take recourse to the All Writs Act.


                            III. CONCLUSION


*7 For the foregoing reasons, the court finds that Petitioners satisfy the requirements for a preliminary injunction, and therefore grants their present motion. An appropriate order accompanies this memorandum opinion.

D.D.C.,2005.
Abdah v. Bush
Not Reported in F.Supp.2d, 2005 WL 711814 (D.D.C.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.