███████████

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA** Filed with Classified
Information Security Officer

| | | |
|---|---|---|
| **ABDULSALAM ALI ABDULRAHMAN** | § | CISO _____ |
| **AL-HELA,** | § | |
| | § | Date  1/30/19 |
| *Petitioner,* | § | |
| | § | |
| v. | § | **Case No. 05-cv-01048(RCL)** |
| | § | |
| **DONALD J. TRUMP** *et al.*, | § | |
| | § | |
| *Respondents.* | § | |

## MEMORANDUM OPINION

Petitioner Abdulsalam Ali Abdulrahman al-Hela is challenging the legality of his detention at the United States Naval Base in Guantanamo, Cuba. Al-Hela was captured in September 2002 and the government has detained him at Guantanamo since 2004. The government contends that al-Hela's detention is lawful under the 2001 Authorization for Use of Military Force (AUMF). Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001) [hereinafter AUMF]. The AUMF authorizes the President to detain individuals who were part of or substantially supported the Taliban, al Qaeda, or associated forces that are engaged in hostilities against the United States or its coalition partners.

Al-Hela argues that his detention is not lawful under the AUMF because he did not join al Qaeda or any other terrorist group, and did not support any such groups. He contends that he was a highly respected businessman, tribal leader, and officer involved in the Yemeni Government's program to deport non-Yemeni Arab veterans of the Afghan-Soviet War who were living in Yemen. Al-Hela also asserts that the AUMF can no longer provide a basis for detention and that his prolonged detention violates the Due Process Clause.

███████████

1

The government filed a Factual Return, which it amended in June 2017. In response, al-Hela filed a Traverse in July 2017. The Court conducted a five-day merits hearing to determine the legality of the petitioner's detention in November 2017. The parties made unclassified and classified opening statements, presented evidence and arguments on the contested issues relating to al-Hela's detention, and delivered classified closing statements. Al-Hela testified at the hearing over the course of two days. Both parties also submitted post-hearing briefs in January 2018. Upon consideration of the record, Factual Return, Traverse, merits hearing, exhibits, and post-hearing briefs, the Court concludes that the government may lawfully detain petitioner under the AUMF because the evidence demonstrates that petitioner more likely than not provided substantial support to al Qaeda and its associated forces. Accordingly, for the reasons set forth below, the Court will **DENY** petitioner's petition for a writ of habeas corpus.

## I.    Background

Petitioner is a Yemeni citizen who is currently detained at Guantanamo. He more likely than not traveled to Afghanistan in the 1980s during the Afghan-Soviet War to fight in the jihad against the Soviets.

In Afghanistan, al-Hela established a relationship with Yasir Tawfiq al-Sirri, who became the leader of a branch of the Egyptian Islamic Jihad (EIJ) called the Vanguards of Conquest.



[redacted]

Al-Hela subsequently returned to Yemen. He engaged in business ventures, established himself as a tribal sheikh, and worked on behalf of Yemen's internal security service, the Political Security Organization (PSO). However, al-Hela also acted outside the scope of Yemen's deportation program and facilitated the travel of Islamic extremists, including members of al Qaeda and its associated force, EIJ. [redacted]

[redacted]

al-Hela was aware of and provided support for several bombing attacks that were planned or carried out by Aden-Abyan Islamic Army (AAIA) members and associates of Osama bin Laden. Petitioner reportedly provided support for the AAIA's bombing of the British Embassy in Sana'a, Yemen on October 13, 2000; the attempted bomb attack on the Yemeni Minister of Interior on December 24, 2000; and the bombings in Aden, Yemen on January 1 and



2, 2001.

Jayul was the mastermind of these attacks, the leader of the AAIA cell that carried out

the attacks, and an associate of Osama bin Laden.



al-Hela was connected with high-level al Qaeda and EIJ operatives.





8



The government contends that al-

Hela's access [REDACTED] information stemmed from his connections with high-level al

Qaeda operatives close to Osama bin Laden.

## II.   Legal Framework

### A. Detention Standard

Shortly after the terrorist attacks against the United States on September 11, 2001,

Congress passed—and President George W. Bush signed—the AUMF. The AUMF states:

> That the President is authorized to use all necessary and appropriate force against
> those nations, organizations, or persons he determines planned, authorized,
> committed or aided the terrorist attacks that occurred on September 11, 2001, or
> harbored such organizations or persons, in order to prevent any future acts of
> international terrorism against the United Stated by such nations, organizations or
> persons.

AUMF § 2(a). The D.C. Circuit in *al-Bihani* held that the AUMF authorizes the President to

detain individuals who were part of or substantially supported the Taliban, al Qaeda, or

associated forces at the time of their capture. *Al-Bihani v. Obama*, 590 F.3d 866, 872 (D.C. Cir.

2010). The National Defense Authorization Act (NDAA) for Fiscal Year 2012 expressly permits

military detention of a "person who was a part of or substantially supported al-Qaeda, the

9

███████████

Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act or has directly supported such hostilities in aid of such enemy forces." National Defense Authorization Act for Fiscal Year 2012, Pub. L. No. 112-81, § 1021, 125 Stat. 1298, 1562 (2011) [hereinafter 2012 NDAA].

Direct participation in hostilities is not required to establish the authority to detain. *See Al-Bihani*, 590 F.3d at 869–73, 881 (holding that the petitioner, who was a cook for the 55th Arab Brigade—an organization that defended the Taliban against the Northern Alliance and harbored al Qaeda—near the front lines and carried arms for the 55th Arab Brigade, but never fired in combat, was lawfully detained); *see also Kandari v. United States*, 744 F. Supp. 2d 11, 22 (D.D.C. 2010) ("[P]roof that an individual actually fought for or on behalf of al Qaeda or the Taliban, while sufficient, is also not required to demonstrate that an individual is 'part of' such enemy forces."). The AUMF justifies holding a detainee at Guantanamo if he was part of or substantially supported al Qaeda, the Taliban, or associated forces at the time of his capture. *Hussain v. Obama*, 718 F.2d 964, 967 (D.C. Cir. 2013). Detention under the AUMF may last for the duration of hostilities. 2012 NDAA § 1021(c)(1); *Hamdi v. Rumsfeld*, 542 U.S. 507, 521 (2004); *al-Alwi v. Trump*, 901 F.3d 294, 297 (D.C. Cir. 2018); *Uthman v. Obama*, 637 F.3d 400, 402 (D.C. Cir. 2011).

         i.     *Detention based on "substantial support"*

The United States may detain a "person who was part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners." 2012 NDAA § 1021. Courts have not defined what conduct constitutes "substantial support" to justify detention under the AUMF.

███████████

In July 2004, shortly after *Hamdi*, the Government created Combatant Status Review Tribunals (CSRT) to determine whether the Guantanamo detainees were enemy combatants. The Department of Defense (DoD) defined the term "enemy combatant" to mean "an individual who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or its coalition partners. This includes any person who has committed a belligerent act or has directly supported hostilities in aid of enemy armed forces." Memorandum from Deputy Sec'y of Def. Paul Wolfowitz re: Order Establishing Combatant Status Review Tribunal § a (July 7, 2004): *see Hamdan v. Bush*, 548 U.S. 557, 571 n.1 (2006) (citing this definition).

In 2008, the Supreme Court's decision in *Boumediene* opened the gates for judicial review of the scope of executive detention authority for Guantanamo detainees. *See Boumediene v. Bush*, 553 U.S. 723 (2008). On remand, Judge Leon adopted the government's prior 2004 CSRT definition of "enemy combatant," concluding that it was consistent with the AUMF and the Constitution. *Boumediene v. Bush*, 583 F. Supp. 2d 133, 134–35 (D.D.C. 2008). On March 13, 2009, the Obama Administration, in a memorandum to the D.C. District Court, "refin[ed]" the government's position regarding its detention authority for "those persons who are now being held at Guantanamo Bay." Respondents' Memorandum Regarding the Government's Detention Authority Relative to Detainees Held at Guantanamo Bay at 1, *In re Guantanamo Bay Detainee Litigation*, Misc. No. 08-442 (TFH) (D.D.C. Mar. 13, 2009). The March 2009 Memo asserted that the scope of executive detention authority "is informed by principles of the laws of war," as those principles "inform the understanding of what is 'necessary and appropriate'" under the AUMF. *Id.* at 1–3. This Memo declared that the government had the authority "to detain persons who were part of, or substantially supported, Taliban or al-Qaida forces or associated forces that

are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act, or has directly supported hostilities, in aid of such enemy armed forces." *Id.* at 1–2.

In 2010, in *al-Bihani*, the D.C. Circuit rejected the notion that the laws of war limit the government's AUMF authority, and looked to the jurisdictional provisions of the Military Commissions Acts (MCA) of 2006 and 2009 for guidance in construing the scope of detention authority under the AUMF. *Al-Bihanai*, 590 F.3d at 871–72. In the 2006 MCA, Congress authorized trial by military commission of "unlawful enemy combatants," and defined this term to mean "a person who has engaged in hostilities or who has purposefully and materially supported hostilities against the United States or its co-belligerent who is not a lawful enemy combatant (including a person who is part of the Taliban, al Qaeda, or associated forces)." Military Commissions Act of 2006 (2006 MCA), Pub. L. No. 109-366, sec. 3, § 948(a)(1), 120 Stat. 2600, 2601. In 2009, Congress enacted a new MCA that authorized the trial of "unprivileged enemy belligerents," who included individuals who "purposefully and materially supported hostilities against the United States or its coalition partners." National Defense Authorization Act for Fiscal Year 2010, Pub. L. No. 111-84, § 1802, 123 Stat. 2190, 2574–76. This led the D.C. Circuit to find that those who "purposefully and materially support" al Qaeda, the Taliban, or associated forces were subject to detention under the AUMF.[1] The Court also declared that the petitioner was lawfully detained whether "the definition of a detainable person [was], as the district court articulated it, 'an individual who was part of or supporting Taliban or al Qaeda forces, or associated forces that are engaged in hostilities against the United States or

---

[1] The D.C. Circuit subsequently approvingly cited *al-Bihani*'s determination that the AUMF permits detention of those who "purposefully and materially support" al Qaeda, the Taliban, or associated forces. *Uthman v. Obama*, 637 F.3d 400, 402 (D.C. Cir. 2011); *Almerfedi v. Obama*, 654 F.3d 1, 4 (D.C. Cir. 2011); *cf. Ali v. Obama*, 736 F.3d 542, at 544 n.1 (D.C. Cir. 2013).

its coalition partners,' or the modified definition offered by the government [in its appellate brief] that requires that an individual 'substantially support' enemy forces." *Al-Bihani*, 590 F.3d at 872. That Court also determined that the facts demonstrated that the petitioner "was both part of and substantially supported enemy forces," and "recognize[d] that both prongs are valid criteria that are independently sufficient to satisfy the standard." *Id.* at 873–74. In denying to rehear the case en banc, the D.C. Circuit described the *al-Bihani* panel's determination that the laws of war do not limit the government's AUMF authority as dicta. *Al-Bihani v. Obama*, 619 F.3d 1, 1 (D.C. Cir. 2010) (Sentelle, C.J., concurring in denial of rehearing en banc).

Although the material support phrase in the MCA's definition of "unprivileged enemy belligerents" is not itself defined, the phrase does appear elsewhere in the MCA. The 2009 MCA made the offense of providing material support to an international terrorist organization engaged in hostilities against the U.S. triable by military commission. 2009 MCA § 950t(25). This provision adopts the definition of "material support" given in 18 U.S.C. § 2339A(b). *Id.* § 950t(25)(B). Under 18 U.S.C. § 2339A(b), the term "material support" is defined as

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

The Supreme Court has articulated the canon of statutory construction that identical words used in different parts of the same statute are presumed to have the same meaning. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 86 (2006) ("Generally, 'identical words used in different parts of the same statute are . . . presumed to have the same meaning.'") (quoting *IBP, Inc. v. Alvarez*, 546 U.S.21, 34 (2005)); *see also* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 170–73 (2012) (the "presumption of

13

consistent usage" indicates that a "word or phrase is presumed to bear the same meaning throughout a text"). This presumption leads to the conclusion that the phrase "material support" in the MCA's definition of "unprivileged enemy belligerents" also has the meaning given to the term in 18 U.S.C. § 2339A(b). Further, it makes sense to look to the definition of "material support" in 18 U.S.C. § 2339A(b) to construe the same phrase in the MCA's definition of "unprivileged enemy belligerents" as the subject matter of these statutory provisions both deal with supporters of terrorism. It follows that this definition should guide this Court's interpretation of the types of conduct that the *al-Bihani* court envisioned would constitute "purposeful and material support" to al Qaeda, the Taliban, or associated forces such as to subject an individual to detention under the AUMF.

Congress subsequently enacted the 2012 NDAA, in which Congress adopted the "substantial support" formulation of the standard of who may be detained under the AUMF. In the 2012 NDAA, Congress "affirm[ed] that the authority of the President to use all necessary and appropriate force pursuant to the [AUMF] includes the authority for the Armed Forces of the United States to detain covered persons . . . pending disposition under the law of war." NDAA 2012 § 1021(a). Congress defined a "covered person" to be:

> (1) A person who planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored those responsible for those attacks.
> (2) A person who was a part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed a belligerent act or has directly supported such hostilities in aid of such enemy forces.

2012 NDAA § 1021(b). Thus, Congress used the phrase "substantial support" rather than the "purposeful and material support" language adopted in *al-Bihani*. But this codification of the "substantial support" formulation does not drastically alter this Court's understanding of the

support prong authorizing detention. The words "substantial" and "material" have extremely similar definitions. "Substantial" is defined as "considerable in amount, value, or worth" by Webster's dictionary. *Webster's Third New International Dictionary* 2280 (2002); *see also Oxford English Dictionary* (3d ed. 2012) (defining "substantial" as "of ample or considerable amount or size; . . . of real significance, weighty; . . . important, worthwhile"). The same dictionary defines "material" as "being of real importance or great consequence; substantial; essential." *Webster's Third New International Dictionary* 1342 (2002); *see also Oxford English Dictionary* (3d ed. 2001) (defining "material" as "having significance or relevance; . . . of serious or substantial import; . . . significant, important, of consequence"). Indeed, these words are used as synonyms for one another. *Roget's International Thesaurus* 762.6, 1050.10 (Robert L. Chapman ed., 5th ed. 1992); *Webster's Thesaurus* (2006). Accordingly, the Court will continue to look to 18 U.S.C. § 2339A(b)'s definition of "material support" for guidance in interpreting the term "substantial support" in the 2012 NDAA. This conclusion is strengthened by the *al-Bihani* court's favorable discussion of the government's "substantial support" standard, and its lack of an effort to distinguish this formulation from the "purposeful and material support" prong that the court focused on. *See Al-Bihani*, 590 F.3d at 872–74. Further, it is clear that the term "substantial support" excludes de minimis forms of support based on the ordinary meaning of the word "substantial."

The scope of the "substantial support" standard is also informed by the laws of war. The 2012 NDAA referred to the type of military detention at issue as "[d]etention under the law of war without trial until the end of the hostilities authorized by the Authorization for Use of Military Force." 2012 NDAA § 1021(c)(1). Determining when the law of war permits individuals to be detained for providing "substantial support" requires analogy to traditional

international armed conflicts. Law of war detention standards permit detention under the "substantial support" prong in at least two broad ways. First, substantial supporters who accompany enemy forces and are apprehended while accompanying such enemy forces may be detained under the law of war by analogy to non-members who accompany armed forces who are subject to detention as Prisoners of War (POW) upon capture under the Third Geneva Convention. Geneva Convention Relative to the Treatment of Prisoners of War art. 4(4), Aug. 12, 1949, 6 U.S.T. 3316, 75 U.N.T.S. 13 [hereinafter Third Geneva Convention]. Second, substantial supporters may be detained under the law of war if they pose a threat to security in relation to the armed conflict. This is premised on analogy to the Fourth Geneva Convention's sanction of security internment for those individuals who are not POWs, but still pose a security threat. Geneva Convention Relative to the Protection of Civilian Persons in Time of War arts. 5, 27, 42, 43, 78, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 28 [hereinafter Fourth Geneva Convention] (permitting internment of protected persons if such internment is considered "absolutely necessary" and internment of protected persons "for imperative reasons of security").

      ii.    *Associated forces*

The AUMF authorizes the use of force against al Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners. AUMF § 2(a); 2012 NDAA § 1021; *Barhoumi v. Obama*, 609 F.3d 416, 432 (D.C. Cir. 2010) (holding that the petitioner was properly detained on the basis that he was part of Abu Zubaydah's militia, which was an associated force of al Qaeda). "Terrorist organizations that act as agents of al Qaeda, participate with al Qaeda in acts of war against the United States [or] systemically provide military resources to al Qaeda . . . in the war against the United States, are analogous to co-

16

belligerents in a traditional war." Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047, 2112–13 (2005).

An associated force must be an organized entity that has entered the fight alongside al Qaeda or the Taliban. Further, an associated force must be a co-belligerent of al Qaeda or the Taliban in hostilities against the United States or its coalition partners as part of the same comprehensive armed conflict. A determination that a group is an associated force, and therefore covered by the AUMF, is necessarily a fact dependent inquiry regarding the group's relationship with al Qaeda or the Taliban and the group's activities. Groups that merely engage in terrorist activities without ties to al Qaeda or the Taliban, and groups that merely sympathize with and embrace the ideology of al Qaeda or the Taliban do not constitute associated forces as such groups would not have entered the fight against the United States or its coalition partners as co-belligerents. *See Hamlily v. Obama*, 616 F. Supp. 2d 63, 76 n.17 (D.D.C. 2009).

   iii. *Lawful detention under the AUMF does not require post-September 11, 2001 activity*

The AUMF authorizes the use of military force, including detention, against "those nations, organizations, or persons [the President] determines planned, authorized, committed or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons." AUMF § 2(a). As noted *supra*, this authority permits the government to hold a detainee if he was part of or substantially supported al Qaeda, the Taliban, or associated forces at the time of his capture. *Hussain*, 718 F.3d at 967. Courts have regularly relied on pre-September 11, 2001 evidence to find that a petitioner's detention is lawful. *See, e.g., Salahi v. Obama*, 625 F.3d 745, 750–51 (stating the Court had "no doubt about the relevance" of an oath of allegiance sworn to al Qaeda in 1991 "to the ultimate question of whether [the petitioner] was 'part of' al-Qaida at the time of his capture"); *see also Khairkhwa v. Obama*, 703 F.3d 547, 548–49 (D.C.

Cir. 2012); *Mousovi v. Obama*, No. 05-1124, 2016 WL 3771240, at *6–7 (D.D.C. June 8, 2016). For example, in *al-Bihani*, the petitioner worked as a cook and carried weapons for the 55th Arab Brigade, an organization that defended the Taliban against the Northern Alliance and harbored al Qaeda, primarily in the period prior to the September 11, 2001 terrorist attacks. *Al-Bihani*, 590 F.3d at 869. The D.C. Circuit found that the petitioner was lawfully detained even though much of his activity occurred prior to September 11, 2001, and the brigade actually disbanded and surrendered shortly thereafter. *Id.* at 872–73.

The government lacks authority to detain someone whose ties with al Qaeda, the Taliban, or associated forces have been sufficiently vitiated by the passage of time, intervening events, or both. *See Al Ginco v. Obama*, 626 F. Supp. 2d 123, 128 (D.D.C. 2009). In *Al Ginco*, the petitioner stayed at a Taliban guesthouse and attended an al Qaeda training camp in 2000. However, al Qaeda leaders accused him of spying and tortured him for three months before turning him over to the Taliban for imprisonment, which lasted more than eighteen months. *Id.* The petitioner was then left behind by his captors—briefly leaving him a free man—when U.S. forces liberated the area, and took him into custody in 2002. *Id.* To determine whether his relationship sufficiently eroded over a sustained period of time such that the relationship was vitiated, the court looked to: (1) the nature of the relationship in the first instance; (2) the nature of the intervening events or conduct; and (3) the amount of time that has passed between the time of the pre-existing relationship and the point in time at which the detainee is taken into custody. *Id.* at 129; *see also Mousovi*, 2016 WL 3771240 at *7. Based on this test, the *Al Ginco* court determined that although a relationship existed between the petitioner and al Qaeda in 2000, petitioner's torture by al Qaeda and subsequent imprisonment by the Taliban "eviscerat[ed]" this relationship by the time petitioner was taken into U.S. custody in 2002. *Al Ginco*, 626 F. Supp.

18

2d at 127–30. This led the court to conclude the petitioner was no longer "part of" al Qaeda or the Taliban at the time he was taken into U.S. custody in 2002 and therefore was not lawfully detainable under the AUMF. *Id.* at 130.

> iv. *Lawful detention under the AUMF does not require the detainee's actions to have taken place in Afghanistan or a specific theater of war*

The AUMF is not geographically limited. The text of the AUMF does not impose any geographic limitation on the use of force. The lack of restrictive language regarding the geographic scope of the conflict authorized in the AUMF stands in stark contrast with numerous prior authorizations for the use of force that contained geographic restrictions. *See, e.g.*, Joint Resolution of Jan. 29, 1955, Pub. L. No. 4, 49 Stat. 7 (authorizing the President to use armed forces against Chinese communists and others to secure and protect Formosa and Pescadores against armed attack); Act of June 30, 1834, ch. 161, §§ 10–11, 23, 4 Stat. 729, 730, 733 (authorizing the President to remove persons from Indian lands); Act of Mar. 3, 1819, ch. 93, § 1, 3 Stat. 523, 523–24 (authorizing the President to take possession of, and to occupy, the territories of East and West Florida); Act of May 28, 1798, ch. 48, 1 Stat. 561 (authorizing the President to seize French vessels "hovering" on the U.S. coast). This lack of restrictive language implies that the AUMF authorizes the use of force wherever individuals and groups covered by the AUMF may be found. This is reinforced by language in the AUMF's preamble that states the September 11, 2001 terrorist attacks "render it both necessary and appropriate that the United States exercise its rights to self-defense and to protect United States citizens both at home and abroad." AUMF pmbl. The armed conflict involving the U.S. and al Qaeda, the Taliban, and associated forces is not limited to Afghanistan. The functional need to prevent the enemy from returning to the battlefield, which a plurality of the Supreme Court in *Hamdi* found to be a "fundamental incident of waging war," applies with equal force when the enemy is found outside

19

of Afghanistan. *See Hamdi*, 542 U.S. at 519. Indeed, the necessity of preventing the enemy from returning to the battlefield does not depend on the location of capture or of the activities justifying detention. *Cf. Ex parte Quirin,* 317 U.S. 19, 38 (1942) (determining that petitioners were still enemy belligerents regardless of whether they "actually committed or attempted to commit any act of depredation or entered the theatre or zone of active military operations").

The D.C. Circuit has relied on evidence of detainees' activities outside of Afghanistan as the basis for detention under the AUMF in several cases. In *Almerfedi*, the D.C. Circuit found that a Yemeni petitioner was lawfully detained based on his activities in Pakistan ands Iran, and did not appear concerned that the petitioner never entered Afghanistan. *Almerfedi v. Obama*, 654 F.3d 1 (D.C. Cir. 2011). The D.C. Circuit in *Ali* also heavily relied on evidence that the petitioner had stayed in an Abu Zubaydah guesthouse in Pakistan and on evidence related to the guesthouse and petitioner's activities there to determine that the petitioner was lawfully detained as a member of an associated force of al Qaeda. *Ali v. Obama*, 736, F.3d 542, 545–50 (D.C. Cir. 2013). Further, the D.C. Circuit did not express concern in *Salahi* or *Bensayah* that the detainees did not have strong linkages to the battlefield in Afghanistan, although the csourt did not make a final determination on whether these detainees were being lawfully held in these opinions. *See Salahi*, 625 F.3d at 748, 753; *Bensayah v. Obama*, 610 F.3d 718, 720 (D.C. Cir. 2010). Thus, individuals may be detained despite remote or non-existent linkages to the traditional battlefield.

v.     *The AUMF continues to supply the government with detention authority*

Petitioner argues that the U.S.'s authority to detain him, if it exists, has unraveled and that the AUMF can no longer provide a basis for his detention. Al-Hela contends that he is effectively subject to indefinite detention because the war against al Qaeda, the Taliban, and

associated forces continues. Pet'r's Post-Hearing Br. 14. Al-Hela asserts that such indefinite detention exceeds the scope of the government's detention authority under the AUMF.

The D.C. Circuit recently rejected this argument in *Al-Alwi v. Trump*. 901 F.3d 294, 297–98 (D.C. Cir. 2018). In 2004, a plurality of the Supreme Court observed in *Hamdi* that it was a "clearly established principle of the law of war that detention may last no longer than active hostilities." *Hamdi*, 542 U.S. at 520–21 (citing Third Geneva Convention art. 118). Based on law-of-war principles, the *Hamdi* Court held that the AUMF's grant of authority "for the use of 'necessary and appropriate force'" authorized the detention of enemy combatants "for the duration of the relevant conflict." *Id.* at 521; *Uthman v. Obama*, 637 F.3d 400, 402 (D.C. Cir. 2011) ("The AUMF . . . authorizes the Executive Branch to detain" enemy combatants "for the duration of hostilities."). Congress affirmed this authority in the 2012 NDAA by expressly permitting "[d]etention under the law of war without trial until the end of the hostilities authorized by the [AUMF]." 2012 NDAA § 1021(c)(1). Accordingly, the D.C. Circuit in *Al-Alwi* held that the AUMF and NDAA "authorize detention until the end of hostilities." *Al-Alwi*, 901 F.3d at 298.

Thus, the government's detention authority is not indefinite. Instead, this authority is based on the ongoing conflict against al Qaeda, the Taliban, and associated forces. Al-Hela does not contend that hostilities have ended.[2] Therefore, the AUMF continues to supply the government with detention authority.

B. Burden of Proof

The government bears the burden of proving by a preponderance of the evidence that the petitioner's detention is lawful. *Al-Bihani*, 590 F.3d at 878; *Awad v. Obama*, 608 F.3d 1, 11

---

[2] The D.C. Circuit in *Al-Alwi* recently determined that hostilities have not ended. *Al-Alwi*, 901 F.3d at 298–300.

(D.C. Cir. 2010) ("A preponderance of the evidence standard satisfies constitutional requirements in considering a habeas petition from a detainee held pursuant to the AUMF."). The "preponderance of the evidence standard 'simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before he may find in favor of the party who has the burden.'" *Barhoumi v. Obama*, 609 F.3d 416, 424 (D.C. Cir. 2010) (quoting *Concrete Pipe & Prods., Inc. v. Constr. Laborers Pension Tr.*, 508 U.S. 602, 622 (1993)). Thus, the government may lawfully detain the petitioner if they demonstrate that the petitioner more likely than not was part of or substantially supported al Qaeda, the Taliban, or associated forces.

C. Evidentiary Standard

In Guantanamo habeas proceedings, the Court must assess the accuracy, reliability, and credibility of each piece of evidence presented by the parties in the context of the evidence as a whole. *Barhoumi*, 609 F.3d at 424; *Awad v. Obama*, 608 F.3d 1, 7 (D.C. Cir. 2010). The Court does not weigh each piece of evidence in isolation. *Awad*, 608 F.3d at 7. Even if no individual piece of evidence alone would justify detention, the evidence may, when considered as a whole and in context, nonetheless demonstrate that the petitioner was more likely than not part of or substantially supported al Qaeda, the Taliban, or associated forces. *Al-Adahi v. Obama*, 613 F.3d 1102, 1105–06 (D.C. Cir. 2010). When a party submits hearsay evidence, "the question a habeas court must ask . . . is not whether it is admissible—it is always admissible—but what probative weight to ascribe to whatever indicia of reliability it exhibits." *Al-Bihani*, 590 F.3d at 879. Thus, the Court will assess the accuracy, reliability, and credibility of all evidence, including hearsay, that is necessary to determine whether the petitioner's detention is lawful.

Further, intelligence reports and interrogation reports are entitled to the presumption of regularity. *Latif v. Obama*, 677 F.3d 1175, 1178 (D.C. Cir. 2012). "The presumption of

regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *Id.* (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007)). The presumption of regularity presumes that in intelligence reports "the government official accurately identified the source and accurately summarized his statement." *Latif*, 677 F.3d at 1180.

Finally, the Court notes that "false exculpatory statements are evidence—often strong evidence—of guilt." *Al-Adahi*, 613 F.3d at 1107.

### D. The Due Process Clause Does Not Apply to Guantanamo

Petitioner argues that his detention is a due process violation.[3] However, the due process clause does not apply to Guantanamo detainees. *See Kiyemba v. Obama*, 555 F.3d 1022, 1026–27 (D.C. Cir. 2009) (*Kiyemba I*), *vacated and remanded*, 559 U.S. 131, *reinstated in relevant part*, 605 F.3d 1046, 1047–48 (D.C. Cir. 2010) (*Kiyemba II*). In *Kiyemba I*, the D.C. Circuit recited numerous Supreme Court cases for the proposition that "the due process clause does not apply to aliens without property or presence in the sovereign territory of the United States." *Kiyemba I*, 555 F.3d at 1026–27 (citing *Zadvydas v. Davis*, 533 U.S. 678 (2001); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 269, 274–75 (1990); *Johnson v. Eisentrager*, 339 U.S. 763, 783–84 (1950)). Although the Supreme Court vacated *Kiyemba I* in order to afford the D.C. Circuit the opportunity to assess the factual circumstances that had changed while the petition for

---

[3] This argument is premised on al-Hela's contention that he is "being held on an indefinite basis without charge or trial, and . . . [President Trump] has said that there will be no further releases from the Guantanamo prison." Pet'r's Post-Hearing Br. 15. Petitioner cites to a tweet by President Trump on January 3, 2017 that "there should be no further releases from Guantanamo." *Id.* at 14. Petitioner states that since President Trump assumed office, "there have been no releases, even of men approved for release in 2016 by the Department of Defense." *Id.* While this statement regarding the lack of releases during President Trump's time in office was accurate when petitioner submitted his post-hearing brief in January 2018, there has since been a Guantanamo detainee, Ahmed Mohammed Ahmed Haza al Darbi, who was transferred on May 2, 2018. Dep't of Defense, *Detainee Transfer Announced* (May 2, 2018), https://dod.defense.gov/News/News-Releases/News-Release-View/Article/1510878/detainee-transfer-announced/. Further, President Trump's tweets do not affect the Court's understanding that detention under AUMF may last for the duration of hostilities.

certiorari was pending, *see* 559 U.S. at 131, the D.C. Circuit reinstated *Kiyemba I*'s judgment and opinion in pertinent part in *Kiyemba II*, 605 F.3d at 1048. In subsequent cases, the D.C. Circuit has confirmed that *Kiyemba II* reinstated *Kiyemba I*'s holding that detainees at Guantanamo do not possess constitutional due process rights. *See Al Madhwani v. Obama*, 642 F.3d 1071, 1077 (D.C. Cir. 2011); *see also Bahlul v. United States*, 840 F.3d 757, 796 (D.C. Cir. 2016) (Millet, J., concurring); *Al Bahlul v. United States*, 767 F.3d 1, 33 (D.C. Cir. 2014) (Henderson, J., concurring). Applying *Kiyemba II*, district courts in this Circuit have refused to recognize due process claims by Guantanamo detainees. *See Ali v. Trump*, 317 F. Supp. 3d 480, 487–88 (D.D.C. 2018); *Salahi v. Obama*, Civ. No. 05-0569, 2015 WL 9216557, at \*5 (D.D.C. Dec. 17, 2018); *Rabbani v. Obama*, 76 F. Supp. 3d 21, 25 (D.D.C. 2014); *Ameziane v. Obama*, 58 F. Supp. 3d 99, 103 n.2 (D.D.C. 2014); *Bostan v. Obama*, 674 F. Supp. 2d 9, 29 (D.D.C. 2009).

## III. Discussion

### A. Assessment of the Evidence

Before the Court can determine the legality of the petitioner's detention, the Court must first assess the accuracy, reliability, and credibility of the evidence presented by the parties. As discussed *supra*, although the intelligence reports relied on by the government are hearsay evidence, hearsay evidence is always admissible in Guantanamo habeas proceedings. The burden is on the party submitting the evidence to establish that it is reliable. After reviewing the exhibits and assessing the parties' arguments made in their briefs to the Court and at the merits hearing, the Court has identified which exhibits are material to al-Hela's petition for a writ of habeas corpus.



i. *Intelligence reports*

Petitioner contends that many of the documents relied on by the government in this case are "anonymous hearsay" and do not provide sufficient information for the Court to assess the reliability of the assertions in the documents. Pet'r's Post-Hearing Br. 16. Petitioner argues that such documents therefore cannot provide a legitimate basis for detention based on the D.C. Circuit's determination in *Parhat* that intelligence consisting of anonymous hearsay in the form of unsupported "bottom-line assertions" cannot be deemed reliable. *See Parhat v. Gates*, 532 F.3d 834, 647 (D.C. Cir. 2008). However, the exhibits that this Court primarily focuses on do not consist of purely bottom-line assertions that are anonymous hearsay as was the case in *Parhat*. These exhibits are not "documents that read as if they were indictments or civil complaints, and that simply assert as facts the elements required to prove that a detainee" is lawfully detained, which is what troubled the Court in *Parhat. Id.* at 850.

The Court has been presented with many of the documents in unredacted form, which has enabled the Court to more fully evaluate the sources. The D.C. Circuit has endorsed this type of *ex parte* consideration of sourcing information. *See Kahn*, 655 F.3d at 31 ("[W]here the source of classified information is ˈhighly sensitive . . . it can be shown to the court . . . alone.'") (quoting *Parhat*, 532 F.3d at 849); *see also Mousovi v. Obama*, 916 F. Supp. 2d 67, 68–69 (D.D.C. 2013) (acknowledging that a court may consider source-related information *ex parte*, even when national security interests preclude disclosure of adequate substitute of the information to petitioner's counsel, where source-identifying information at issue was of the type "that courts have recognized as deserving special protection both inside and outside the arena of Guantanamo litigation").



26



  iii. *Third-party statements*

Petitioner challenges the reliability of several of the sources that the government relies

on. 



   iv. *Petitioner's testimony*

Petitioner's live testimony differed

           Petitioner gave vague and non-responsive answers at times.[5] The Court also found that petitioner gave false testimony. Considering al-Hela's personal stake in the proceedings and the reliable evidence in the record, there are portions of petitioner's testimony that the Court cannot accept. To the extent that al-Hela's current narrative is inconsistent with his own     statements, the Court defers to the latter statements. In the instances in which the Court has found that petitioner made false exculpatory statements, the Court has treated these statements as evidence of guilt. *See Al-Adahi*, 613 F.3d at 1107.

---

[5] The Court is mindful that petitioner was testifying about events that occurred between fifteen and twenty-five years ago and has taken this consideration into account.

### B. EIJ and AAIA are Associated Forces of Al Qaeda

#### i. *Egyptian Islamic Jihad*

EIJ first became active in the late 1970s.[6] U.S. Dep't of Homeland Sec., U.S. Customs & Border Patrol, *Terrorist Organization Reference Guide* (Jan. 4, 2004), Resp'ts' Ex. 88, R-480 [hereinafter RX 88]. The group has sought to overthrow the Egyptian government to replace it with an Islamic state, and has sought to attack U.S. and Israeli interests in Egypt and abroad. *Id.*; Nat'l Ground Intelligence Ctr., *NGIC Assessment: Egyptian Islamic Jihad: Doctrine and Tactics Overview*, Resp'ts' Ex. 87, R-469 [hereinafter RX 87]. Initially, EIJ carried out attacks against Egyptian government officials, and was responsible for the assassination of Egyptian President Anwar Sadat in 1981. RX 87, R-469; RX 88, R-480. The group also claimed responsibility for the attempted assassinations of Egyptian Interior Minister Hassan al-Alfi and Egyptian Prime Minister Atef Sedky in 1993. RX 87, R-470; RX 88, R-480. The group began to focus on targets outside of Egypt in the mid-to-late 1990s. The group was responsible for the Egyptian Embassy bombing in Islamabad, Pakistan in 1995. RX 87, R-470; RX 88, R-480. Further, EIJ planned to attack the U.S. Embassy in Albania in 1998, but this was thwarted when Albanian authorities arrested several EIJ members during a crackdown on Islamic extremists. RX 87, R-470; RX 88, R-480. Most of the EIJ network is located outside of Egypt, with cells in at least Yemen, Afghanistan, Pakistan, Lebanon, Sudan, and the United Kingdom. *Id.*; Nat'l Ground Intelligence Ctr., *NGIC Assessment: Egyptian Islamic Jihad: Organization, Strength, and Locations*, Resp'ts' Ex. 86, R-465 [hereinafter RX 86].

---

[6] The Egyptian Islamic Jihad is also known as Islamic Jihad, al-Jihad, Jihad Group, and Vanguards of Conquest. CRS Report for Congress: Foreign Terrorist Organizations (Feb. 6, 2004), Resp'ts' Ex. 82, R-435 [hereinafter RX 82]; U.S. Dep't of Homeland Sec., U.S. Customs & Border Patrol, *Terrorist Organization Reference Guide* (Jan. 4, 2004), Resp'ts' Ex. 88, R-480 [hereinafter RX 88].

29

███████████

EIJ became increasingly close to Osama bin Laden and al Qaeda in the 1990s. RX 87, R-469. Ayman al-Zawahiri took over as EIJ's leader, and subsequently also became Osama bin Laden's deputy. *Id.* He now serves as the current leader of al Qaeda. In 1998, Zawahiri signed Osama bin Laden's fatwa that urged Muslims to kill Americans worldwide. *Id*; *see* Nat'l Comm'n on Terrorist Attacks Upon the United States, *The 9/11 Commission Report* 47 (2004) [hereinafter *The 9/11 Commission Report*]. EIJ became a primary ally for Osama bin Laden, and EIJ members had access to al Qaeda training facilities and terrorist operatives. RX 87, R-471. EIJ officially merged with al Qaeda in June 2001. Decl. of ███████ Al-Qaida (Sept. 22, 2008), Resp'ts' Ex. 1, R-001–05 [hereinafter RX 1]; RX 86, R-463–67; RX 88, R-480; *see The 9/11 Commission Report*. This means that EIJ was part of al Qaeda prior to the September 11, 2001 terrorist attacks and has continued to fight as a part of al Qaeda against the United States.

On September 23, 2001, EIJ's assets were frozen under Executive Order 13224. Blocking Property and Prohibiting Transactions with Persons who Commit, Threaten, or Support Terrorism, 66 Fed. Reg. 49,079 (Sept. 23, 2001). On October 6, 2011, the United Nations Security Council placed EIJ on the list of entities associated with al Qaeda and therefore subject to sanctions under UN Security Council resolutions. United Nations Security Council, *Egyptian Islamic Jihad*, United Nations, https://www.un.org/sc/suborg/en/sanctions/1267/aq_sanctions_list/summaries/entity/egyptian-islamic-jihad (last visited Dec. 12, 2018) ("EIJ has been active worldwide under the auspices of Al-Qaida. EIJ operatives played a key role in the attacks on the World Trade Center in 1993 and 2001."). Further the group was designated as a Foreign Terrorist Organization by the U.S. in 2002.

Accordingly, EIJ was an associated force of al Qaeda at the time of al-Hela's capture in 2002. EIJ was an organized entity that began participating in an increasingly close fashion with

███████████

al Qaeda at least by the mid-to-late 1990s. EIJ, under the leadership of Ayman al-Zawahiri, made clear that the U.S. was one its primary enemies when Zawahiri signed bin Laden's fatwa in 1998 and planned to attack the U.S. Embassy in Albania that same year. EIJ then officially merged with al Qaeda in June 2001. There is no doubt that EIJ therefore became part of al Qaeda at least at this point. Thus, EIJ is a co-belligerent of al Qaeda in the hostilities against the U.S. as part of the same comprehensive armed conflict, participating in acts of war against the U.S.

      ii.    *Aden-Abyan Islamic Army*

AAIA emerged publicly in 1998 when the group released a series of communications that expressed support for Osama bin Laden, advocated for the overthrow of the Yemeni government, and appealed for operations against the U.S. and other Western interests in Yemen.[7] RX 88, R-481–82.

The group engaged in bombings and kidnappings to promote its goals. In December 1998, AAIA kidnapped sixteen American, British, and Australian tourists near Mudiya in southern Yemen. RX 88, R-481–82. Yemeni authorities captured and tried those responsible for the Mudiyah kidnapping and executed AAIA's leader, Zein al-Abidine al-Mihdar for his role in the kidnapping in 1999. *Id.* Also, an AAIA member, Abu Bakr Jayul, and three associates bombed the British Embassy in October 2000. *Id.* In 2001, these individuals were convicted for their role in this terrorist attack in a Yemeni court. *Id.*

On September 23, 2001, AAIA's assets were frozen under Executive Order 13224. Blocking Property and Prohibiting Transactions with Persons who Commit, Threaten, or Support

---

[7] Aden-Abyan Islamic Army is also known as the Islamic Army of Aden (IAA). RX 88, R-481.



Terrorism, 66 Fed. Reg. 49,079 (Sept. 23, 2001). On October 6, 2001, the United Nations Security Council placed AAIA on the list of entities associated with al Qaeda and therefore subject to sanctions under UN Security Council resolutions. United Nations Security Council, *Islamic Army of Aden*, United Nations, https://www/un.org/sc/suborg/en/sanctions/1267_aq_ sanctions_list/summaries/entity/islamic-army-of-aden (last visited Dec. 12, 2018). Further, AAIA was included in Counterterrorism (CT)-Tier 1 by the Interagency Intelligence Committee on Terrorism (IICT) in September 2005, which is a classification for terrorist groups that have demonstrated the intention and capability to attack U.S. persons or interests. IICT Quartery Review of CT-Tiers – September 2005, Resp'ts' Ex. 84, R-448–62 [hereinafter RX 84]. This demonstrates that AAIA continued to threaten U.S. persons and interests after September 11, 2001.

The Court finds the intelligence reports and expert assessments provided by the government to be more instructive on AAIA's relationship with al Qaeda.

AAIA was an associated force of al Qaeda at the time al-Hela was captured in 2002. AAIA assumed this associated force status at least by 2001, at which time the organization had proclaimed its support for the leader of al Qaeda, had strong ties to the leader of al Qaeda, and had conducted multiple attacks against U.S. persons and interests and U.S. coalition partners. Thus, AAIA acted as an agent of al Qaeda and entered the fight alongside al Qaeda by

participating in hostilities against the U.S. and its coalition partners in the same comprehensive armed conflict.

### C. Petitioner More Likely Than Not Substantially Supported Al Qaeda and Associated Forces

  i. *Al-Hela more likely than not went to Afghanistan to fight against the Soviets*

The government contends that al-Hela first became acquainted with al Qaeda and its associated forces while he was in Afghanistan during its war against the Soviet Union in the 1980s. This allegation is based on reporting from multiple sources. Al-Hela denies this contention and asserts both that he was too young to have fought in Afghanistan and that the sources the government relies on to establish his presence there are unreliable.

  a. The Court finds it is more likely than not that al-Hela was present in Afghanistan during the war against the Soviets

The government relies on multiple sources to support its contention that al-Hela participated in the jihad in Afghanistan.                          al-Hela was involved in the war against the Soviets in Afghanistan.

The Court does not address whether al-Hela was part of al Qaeda or an associated force in this Opinion because the Court finds that it is more likely than not that al-Hela provided substantial support to al Qaeda and its associated forces, which is sufficient to justify petitioner's detention under the AUMF.



Although petitioner challenges each of these pieces of evidence in isolation, the D.C. Circuit has been clear that evidence should be viewed in conjunction with each other and not in isolation. *See Bensayah*, 610 F.3d at 725–26 (rejecting the contention that pieces of evidence, even if each might be unreliable if viewed in isolation, cannot corroborate each other). These reports corroborate each other as each report identified Al-Hela as an individual who was in Afghanistan fighting against the Soviets. Under the totality of the circumstances, the Court concludes that the government has shown it is more likely than not that al-Hela was in Afghanistan fighting the Soviets.

         b. The Court concludes that al-Hela was born in 1968; but he was old enough to be in Afghanistan even if he was born in 1971

Petitioner argues that he was too young to have fought in Afghanistan against the Soviets. According to the government, al-Hela was born in 1968, meaning that he would have been about 20 years old when the Soviets finished withdrawing from Afghanistan in 1989. The basis for the government's position is al-Hela's passport, which lists 1968 as the year he was born.

However, al-Hela contends his true birthdate is June 21, 1971. Tr. vol. 2, 3–4. If true, he would have only been 17 years old when the Soviets finally withdrew from Afghanistan. Al-Hela

argues this means he was too young to have gone to Afghanistan and participated in hostilities. Al-Hela claims that he knows he was born in 1971 because that date was recorded by his father in the family Koran. Al-Hela says that he lied about his age on his passport to make himself appear older, which helped him to gain respect in the business community. *Id.*

The Court concludes that al-Hela was born in 1968, not 1971. Even if al-Hela's family Koran says that he was born in 1971, the Court has never seen it and al-Hela's words are not enough to support the contention. Al-Hela either lied to the Yemeni government when he listed 1968 as his birth year on his passport, or he lied to this Court when he said he was born in 1971. Either way, al-Hela has shown a willingness to lie to government officials when he believes it will advance his interests. The Court finds that he has more reason to lie now—to make it appear that he was too young to fight in Afghanistan and to bolster his chances of success in these proceedings—than he did to lie on his passport. Given these facts, the Court finds it more likely that al-Hela was born in 1968, which would have made him about 20 in 1989 and old enough to fight in Afghanistan.

Even if al-Hela was born in 1971, that does not mean he was too young to fight in Afghanistan. As al-Hela admits, he would then have been 17 when the Soviets finally withdrew from Afghanistan. The Court does not see why this would preclude him from going to Afghanistan to fight against the Soviets. People fight in wars when they are 17 or even younger. So even if al-Hela told the truth to this Court (meaning he lied to the Yemeni government), he would have been old enough to have gone to Afghanistan to fight.

Al-Hela also argues that he could not have gone to Afghanistan to fight the Soviets during the 1980s because his family situation would not allow it. According to al-Hela, his father died in 1983, when al-Hela was 12 years old. *Id.* at 6–7. At that point, al-Hela says he became

responsible for taking care of his mother and his siblings. *Id.* at 7. This does not persuade the Court that al-Hela could not have been in Afghanistan. Even individuals who are responsible for caring for their families leave to fight in wars. The Court does not see this event as something that would have prohibited al-Hela from going to Afghanistan. Therefore, the Court is not persuaded by al-Hela's claim that his age and family responsibilities prevented him from going to Afghanistan in the 1980s.

ii. *Al-Hela facilitated the travel of Islamic extremists, including members of al Qaeda and EIJ*

It is uncontested that al-Hela was involved with Yemen's deportation program. Yemen deported non-Yemeni Islamists that had fought in Afghanistan as part of the mujahedeen against the Soviets and settled in Yemen after the war. These individuals were referred to as "Afghan Arabs." As part of petitioner's involvement in the deportation program, his job was to communicate with tribal sheikhs to arrange for the deportation of non-Yemeni Afghan Arabs living within their territory and perhaps under their protection. Some of these Afghan Arabs were likely members of al Qaeda and EIJ. Al-Hela contends that all of his activity facilitating the travel of Afghan Arabs and other suspected terrorists was sanctioned by the Yemeni government. The government adamantly disagrees, but contend that even if al-Hela's actions were entirely government-sanctioned, it nonetheless has the authority to detain petitioner under the AUMF. Resp'ts' Post-Hearing Br. 38. The Court does not need to reach the issue of whether al-Hela could be lawfully detained under the AUMF if his activities were entirely sanctioned by the Yemeni government because the Court concludes that al-Hela engaged in travel facilitation activities for terrorists beyond the scope of any government sanctioned activity that constitute substantial support to al Qaeda and its associated force, EIJ.

36



a. Al-Hela facilitated terrorists' travel

During al-Hela's testimony at the merits hearing, he stated that he never provided false passports to the Afghan Arabs. Tr. vol. 4, 36 ("Q: And you didn't provide false passports to any of the Afghan Arabs to leave Yemen.? [Al-Hela's Answer]: Never. And neither to Afghan Arabs."). This directly contradicts al-Hela's own statements

Petitioner never testified that he lied

about providing false passports to extremists, and petitioner never claimed he had not disclosed such information.

37





[redacted]

[redacted] al-Hela never specifically stated that there was any misunderstanding or mistranslations regarding his disclosure that he provided false passports. Further, al-Hela did not testify that he did not discuss the topic of providing false passports to extremists [redacted] The Court finds the contemporaneous reporting in the intelligence documents of al-Hela's admissions to be more credible than al-Hela's 2017 testimony. This leads the Court to conclude that al-Hela falsely testified during the merits hearing when he said he never provided false passports to Afghan Arabs. Such "false exculpatory statements are evidence—often strong evidence—of guilt." *Al-Adahi*, 613 F.3d at 1107.

Numerous sources corroborate al-Hela's [redacted] admissions of facilitating the travel of extremists. [redacted]

[redacted]

the information about al-Hela providing travel documentation to extremists has been corroborated by multiple ▓ sources. The D.C. Circuit has been clear in the Guantanamo habeas setting that pieces of evidence that may be unreliable if viewed in isolation can corroborate each other. *Bensayah*, 610 F.3d at 725–26.



intelligence documents from numerous sources provide robust corroboration that al-Hela facilitated the travel of extremists, including members of Osama bin Laden's group, which refers to al Qaeda members, and members of EIJ, which is an associated force of al Qaeda.[11] This

evidence also shows that al-Hela facilitated this travel by providing false passports and other false travel documentation, contrary to al-Hela's testimony at the merits hearing.

> b. There are numerous specific examples of al-Hela's travel facilitation for extremists and instances in which al-Hela's services were sought by important al Qaeda figures

The government also presents specific examples where al-Hela facilitated the travel of extremists and where his services were sought by important al Qaeda figures.



This indicates that al-Hela had a very close relationship with al Qaeda leaders, which further establishes that al-Hela was more likely than not an important travel facilitator for al Qaeda and its associated forces.





Once again, the Court finds the contemporaneous intelligence reports to be more credible than al-Hela's vague testimony



This is further evidence of al-Hela providing assistance to important terrorist figures, including members of al Qaeda and associated forces as well as close associates of these groups, to help them travel freely.



45



The Court finds that the contemporaneous intelligence reporting based on petitioner's own ███████████████ statements is more reliable and credible than al-Hela's testimony 17 years later.



In addition, al-Hela points out the lack of evidence showing al-Hela actually facilitated the travel out of Yemen of al-Harithi or anyone linked to the USS Cole attack. *See, e.g.*, Tr. vol. 8, 295. Although the government has not presented evidence that al-Hela followed through on al-

Harithi's request to help him and his "friends" flee Yemen, the Court nonetheless believes that this evidence is significant because it demonstrates that al-Harithi, a close associate of Osama bin Laden and important al Qaeda member, went to al-Hela after the USS Cole attack to inquire about travel facilitation. In the immediate aftermath of the attack on the USS Cole, al Qaeda members in Yemen would likely have been very cautious about those they reached out to for travel facilitation. The fact that al-Harithi was comfortable reaching out to al-Hela indicates that al-Hela was seen by members of al Qaeda as a trusted travel facilitator for members of the group. This increases the likelihood that al-Hela facilitated the travel of members of al Qaeda beyond the scope of the Yemeni government's deportation program.

### c. Al-Hela's Yemeni government defense is insufficient

Al-Hela's facilitation of travel for terrorists was not all authorized by the Yemeni government as part of its deportation program. Numerous sources reported that al-Hela facilitated extremists' travel by using fraudulent travel documentation and stated that al-Hela exploited his government connections to facilitate extremists' travel. Facilitating the travel of individuals by using fraudulent documents and exploiting one's position is inconsistent with a legitimate government authorized program. Instead, these actions strike the Court as illicit.



These fraudulent acts would not have been part of a legitimate government program, and providing passports under false identities to

48



Yemenis would not have been part of Yemen's deportation program as that program was focused

on foreigners.

this evidence does

demonstrate that al-Hela appears to have been willing to operate beyond the scope of the

government authorized deportation program to provide false travel documents and to help extremists travel freely.

Further, al-Hela was said to have profited from his activities providing fraudulent travel documents.

lends credibility to the statement that al-Hela sold passports to associates of bin Laden, which indicates they were al Qaeda members, and earned a personal profit from this activity. Obtaining a personal profit from these activities strongly suggests that these actions were not all done as part of Yemen's official government authorized deportation program. An individual engaged solely in legitimate government activity would likely not have been selling passports to extremists for a personal profit.

The Court does not doubt that some of al-Hela's deportation activities may have been authorized as part of Yemen's official deportation program, but it is more likely than not that al-Hela also engaged in activities that were not sanctioned by the Yemeni government.



Finally, al-Hela cites an extract from U.S. Central Command's (CENTCOM) daily highlights from November 26, 2002, shortly after al-Hela was captured, saying Qamish, sent a report to President Saleh defending al-Hela's actions. *See* Extract from CENTCOM Daily Highlights (Nov. 26, 2002), Pet'r's Ex. 261, P-2294 [hereinafter PX 261]. Qamish's report stated that Al-Hela was a PSO agent who reported on al Qaeda and EIJ activities in Yemen, and was following PSO orders to "control the EIJ and al-Qaida networks in Yemen." *Id.* However, this CENTCOM daily highlights extract also includes an assessment that



52



*Id.* Indeed, the PSO likely had substantial links to extremists. To the extent al-Hela may have sometimes followed the lead of officials when facilitating the travel of extremists, this does not mean that he was not supporting terrorists or that he was not acting outside the scope of the Yemeni government's official deportation program.

The Court finds that it is more likely than not that al-Hela was not solely taking part in legitimate government authorized activity, and was not working against the interests of al Qaeda and EIJ. Again, al-Hela's provision of fraudulent travel documents to extremists is inconsistent with a legitimate government program. Ultimately, the government has demonstrated that it is more likely than not that al-Hela engaged in activities to facilitate the travel of extremists, including members of al Qaeda and its associated force, EIJ, outside the scope of Yemen's deportation program. *See Hamdi*, 542 U.S. at 534 ("[O]nce the Government puts forth credible evidence that the habeas petitioner meets the [AUMF's detention] criteria, the onus could shift to the petitioner to rebut that evidence with more persuasive evidence that he falls outside the

criteria."). Al-Hela is detainable for, among other things, facilitating the travel of members of al Qaeda and EIJ by providing false passports to help these terrorists travel freely out of Yemen to other countries. This allowed these al Qaeda and EIJ members to continue to engage in terrorist activities and to escape the possibility of being arrested. This activity constitutes substantial support to al Qaeda and its associated force, EIJ.

iii.    *Al-Hela provided support for bombing attacks that were planned or carried out by AAIA members and associates of Osama bin Laden*

The government accuses al-Hela of providing logistical, planning, and organizational support for several bombings that were planned or carried out by AAIA members or others associated with Osama bin Laden and al Qaeda. The government alleges that al-Hela was involved in the following bombings: the AAIA bombing of the British Embassy in Sana'a on October 13, 2000; a planned missile attack on the U.S. Embassy in Sana'a in October 2000; the attempted assassination of Yemeni Minister of the Interior on December 24, 2000; the 2001 New Year's Day bombings in Aden, Yemen; and a second planned attack on the U.S. Embassy in Sana'a in spring 2001.

a.    Al-Hela more likely than not provided support for AAIA's bombing of the British Embassy, attempted bomb attack on the Yemeni Minister of Interior, and 2001 New Year's Day bombings in Aden

Al-Hela was identified as an individual involved in organizing and supporting the attack against the British Embassy in October 2000, the attempted assassination of the Yemeni Minister of Interior in December 2000, and the New Year's Day bombings in Aden in January 2001.



55



Al-Hela attacks the evidence that he provided support for these bombings as being

largely based on secondhand reports ██████████████████ who petitioner argues

should not be trusted. Pet'r's Post-Hearing Br. 41.

Petitioner asserts that the allegation that he was involved in the plot to



assassinate the Interior Minster was investigated by the Yemeni government and that he was completely exonerated. Finally, he points out that he continued to live openly in Sana'a for nearly two years after these attacks occurred and was not charged for any involvement with the bombings, which petitioner says demonstrates he was not involved.





Accordingly, the Court finds that it is more likely than not that al-Hela provided support for the British Embassy bombing, the assassination attempt against the Minister of Interior, and the New Year's Day bombings.







During the merits hearing, al-Hela testified that Jayul and his friends stated that something needed to be done to the U.S. Embassy in retaliation for Israeli hostilities against Palestinians during clashes in Jerusalem, Gaza, and the West Bank in September 2000. Tr. vol. 3, 62–63. Al-Hela then stated that he, along with others, received information from either Jayul or al-Harithi that a group planned to shoot something at the U.S. Embassy. *Id.* at 63. On cross-examination, al-Hela again identified that it was Jayul who stated that there was a plan, or at least desire, to attack the U.S. Embassy. Tr. vol. 4, 28–30. Al-Hela subsequently equivocated that he could not remember whether it was Jayul or others who told him that there might be an attack against the U.S. Embassy. *Id.* at 31. Al-Hela then back-tracked by stating that when he said there was a group that planned to "shoot" something at the U.S. Embassy, he was actually just referring to the general concept of an attack. *Id.* Further, al-Hela testified that he told Director Qamish and his deputy, Surmi, about what he learned from Jayul regarding the plan to attack the U.S. Embassy, and claimed that the attack did not occur because he informed U.S. Embassy personnel and the Yemeni government about the potential attack. *Id.* at 25, 32.

61



the Court finds that the

contemporaneously recorded intelligence reports based on information from al-Hela himself are

the most credible and reliable sources of information about the planed attack against the U.S.

Embassy and al-Hela's role in this plot.

al-Hela never testified that

he lied or exaggerated his involvement in the planned attack

Thus, the Court finds no reason to

disbelieve petitioner's own admissions about his involvement in the

planned attack against the U.S. Embassy.

Therefore, the Court finds that al-Hela was indeed approached by associates of Osama

bin Laden to facilitate ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ an attack against the U.S. Embassy.

Jayul was a member of AAIA, which is an associated force of al Qaeda,

and al-Harithi was a member of al Qaeda so al-Hela's support for the terrorist activities of either

of these individuals would fall within the purview of the AUMF.

Finally, the type of support that the perpetrators sought from al-Hela—logistical and planning support—is consistent with the type of support al-Hela was described as providing for the British Embassy bombing, the attempted assassination of the Minister of Interior, and the New Year's Day bombings. Thus, the multiple accounts of al-Hela providing support for terrorist attacks tend to corroborate one another.

     c. Al-Hela was more likely than not involved in a second planned attack on the U.S. Embassy in Sana'a

Al-Hela more likely than not provided logistical support to a terrorist cell that was plotting to attack a U.S. target in Sana'a in spring 2001.



Although ███ reports do contain multiple layers of hearsay and

███ may have had some bias ███████████████

the logistical and planning support that al-Hela is alleged to have provided to this

cell of primarily AAIA members for this plot is the same type of support that al-Hela was asked

to provide in previous attacks. Al-Hela himself admitted

that associates of Osama bin Laden sought his logistical support for a previous plot against the

U.S. Embassy—which was also the likely target of this attack. Therefore, the multiple accounts

of al-Hela providing support for terrorist attacks tend to corroborate one another. *See Bensayah*,

610 F.3d at 726 (even two pieces of evidence that a court may consider "unreliable when viewed

alone" can corroborate each other, and therefore be afforded probative weight).





e. The fact that al-Hela was not taken into custody for almost two years after the bombings does not undermine the government's case against him

Al-Hela argues that the fact that he lived openly in Sana'a for nearly two years after the bombings demonstrates that he was not responsible for the attacks and was not involved in supporting the plots. This argument fails on multiple grounds.

The Court does not read anything into the fact the U.S. government did not pursue criminal charges against al-Hela. Al-Hela's argument ignores the difference between criminal prosecution and detention under the AUMF. Criminal prosecution requires a significantly greater

██████████████

burden of proof than detention under the AUMF. The U.S. government may not have believed it had sufficient evidence to prove beyond a reasonable doubt that al-Hela supported these bombings and planned attacks. Alternatively, the U.S. government may have been dissuaded from bringing criminal charges because it did want to have to use highly classified intelligence reporting in a criminal prosecution against al-Hela. There are many factors that go into the decision of whether to pursue criminal charges and the Court does not believe the lack of criminal charge against al-Hela is entitled to any weight.

Also, the government currently relies on the AUMF as its authority to detain al-Hela. The AUMF did not exist at the time of bombings. The AUMF was not passed until September 2001, which was nearly a year after the British Embassy bombing and plot to conduct a missile attack against the U.S. Embassy.

Further, this argument ignores the fact that more information was acquired over time ███

██████████████████████████████

██████████████████████ reporting demonstrates

that the evidence of al-Hela's support for terrorism, including al Qaeda and its associated forces, grew over time. ████████████████████████

██████████████████████████████

██████████████████████████████

██ new evidence corroborated earlier intelligence about al-Hela's support for extremists, which made this evidence more credible. The new evidence naturally caused the U.S. government to change its assessment of al-Hela. ████████████████████



 iv. *Al-Hela was connected with high-level al Qaeda operatives and members of EIJ*

Al-Hela was connected with high-level al Qaeda and EIJ operatives.





The Court does not find that al-Hela's alternative explanation for the presence of his information ████████ is more likely than the government's explanation, which is that al-Hela had ties to members of al Qaeda and other terrorist groups. Thus, the Court credits this inculpatory evidence of al-Hela's involvement with al Qaeda and other extremist groups.









74



75



███████████

████████████████ al-Hela had extensive relationships and connections with high-level al Qaeda and EIJ members. These relationships show al-Hela was a trusted and important person within the jihadi community. This increases the likelihood that al-Hela facilitated travel for members of al Qaeda and its associated force, EIJ, and supported numerous terrorist attacks that were primarily conducted by al Qaeda's associated force, AAIA. Al-Hela likely developed these relationships with al Qaeda and EIJ members and gained their trust as a result of the substantial support he provided these groups.



The evidence shows that it is more likely than not that al-Hela provided substantial support for al Qaeda and its associated forces, EIJ and AAIA—that is the Court's inquiry.

Al-Hela also argues that he had terrorist information ████████ from his work with the PSO, and not because he was part of or supporting terrorist organizations. Al-Hela may have obtained some terrorist information from his work with the PSO as he claims, but the evidence also shows that al-Hela facilitated the travel of members of al Qaeda and EIJ outside the scope of

███████████



his government duties, and that he provided support for terrorist attacks conducted primarily by

AAIA. Those activities were not part of any legitimate government authorized program.

Finally, petitioner's counsel contends that al-Hela cannot be lawfully detained under the

AUMF because ⬛⬛⬛⬛⬛⬛ it had not identified any statutory material

support to terrorism issues applicable to al-Hela as of October 17, 2000.



While the Court looks to the definition of what constitutes "material support" to guide its interpretation of the phrase "substantial support," the criminal statute on material support to terrorism has a different legal standard than the habeas standard of whether al-Hela was part of or substantially supported al Qaeda, the Taliban, or its associated forces.

vi.    *Al-Hela's ties with and support for al Qaeda and its associated forces had not dissipated at the time he was captured*

The evidence before the Court demonstrating al-Hela more likely than not supported al Qaeda and its associated forces primarily focuses on al-Hela's activities in the late 1990s through 2001. This leaves a period of over a year until al-Hela was detained in which the government has not submitted evidence about al-Hela's support for al Qaeda and its associated forces. Nonetheless, al-Hela's relationship and support for al Qaeda and its associated forces was not sufficiently eroded such that the relationship was vitiated.

The court in *Al Ginco* examined three factors in assessing whether a pre-existing relationship sufficiently eroded over a sustained period of time such that the relationship was vitiated: (1) the nature of the relationship in the first instance; (2) the nature of the intervening events or conduct; and (3) the amount of time that has passed between the time of the pre-existing relationship and the point in time at which the detainee is taken into custody. In this case, al-Hela had an extremely strong relationship with al Qaeda and its associated forces, EIJ and AAIA. He more likely than not facilitated the travel of members of al Qaeda and EIJ, among other terrorist groups, for years. He more likely than not supported multiple terrorist attacks and attempted plots against the U.S. Embassy in Sana'a. Further, he had relationships with many members of al Qaeda, EIJ, and AAIA. Unlike in *Al Ginco*, al Qaeda and its associated forces never turned on al-Hela, imprisoned him, or subjected him to brutal treatment. Instead, only a rather short amount of time passed between the time period from which the government's evidence comes from and the point in time at which al-Hela was taken into custody. There is absolutely no evidence in this case that al-Hela's relationships with al Qaeda, EIJ, and AAIA members dissipated at all. There is no evidence that he ceased providing support for these terrorist groups. Thus, al-Hela's ties to and substantial support for al Qaeda and its associated forces were not vitiated by the passage of time.

vii. *Al-Hela substantially supported al Qaeda and its associated forces*

Al-Hela provided substantial support to al Qaeda and its associated forces, EIJ and AAIA. As the Court discussed, the Court looks to the definition of "material support" in 18 U.S.C. § 2339A(b) for guidance in construing the meaning of the "substantial support" prong of detention authority. The Court also interprets this authority based on the principles of the laws of war.

Under 18 U.S.C. § 2339A(b), the term "material support" is defined as:

any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

Al-Hela's conduct clearly falls within this definition. He facilitated the travel of members of al Qaeda and its associated force, EIJ. Al-Hela helped these extremists obtain false travel documents, including fraudulent passports and passports with false identities, to help them travel freely out of Yemen. He helped these extremists travel to countries other than their home countries where some were wanted for crimes and were to be extradited. Thus, al-Hela's travel facilitation activities enabled members of al Qaeda and EIJ to travel to other countries to commit acts of terrorism and to further the aims of the enemy forces in the conflict against the United States and its coalition partners. These actions were not merely the independent conduct of a freelancer. *See Bensayah*, 610 F.3d at 722, 725. Al-Hela's relationship with al Qaeda stretched back to his days in Afghanistan fighting against the Soviets. He had numerous ties to important members of al Qaeda and EIJ, among other terrorist organizations. He was a trusted and important facilitator for these groups, and purposefully provided substantial support to them.

Al-Hela also provided logistical support to numerous terrorist attacks and plots, which were primarily conducted or planned by AAIA. These actions certainly constitute substantial support, as this service aided AAIA in carrying out several successful bomb attacks—including against the U.S.'s coalition partner, the British—and in planning to attack the U.S. Embassy in Sana'a.

Al-Hela's detention is consistent with the laws of war. By analogy to traditional international armed conflicts, al-Hela's actions demonstrate that he posed a threat to security in

81

███████████████

relation to the armed conflict between the U.S. and al Qaeda, the Taliban, and associated forces such that he would be subject to internment under the Fourth Geneva Convention. *See* Fourth Geneva Convention, arts. 5, 27, 42, 43, 78. Al-Hela's travel facilitation activities enabled members of al Qaeda and EIJ to travel freely and avoid arrest, enabling them to plot and conduct attacks and to remain an active part of the enemy's forces. His logistical support also directly enabled AAIA to strike the U.S.'s coalition partner and attempt to strike the U.S. Thus, under law of war principles, the government may detain al-Hela for imperative reasons of security. Accordingly, the government may detain al-Hela under the AUMF based on his substantial support for al Qaeda and its associated forces.

## IV.   Conclusion

The totality of the evidence, when considered as a whole, establishes by at least a preponderance of the evidence that al-Hela provided substantial support to al Qaeda and associated forces. Al-Hela had multiple associations with al Qaeda and associated forces, facilitated travel for extremists including members of al Qaeda and associated forces, and provided logistical support for bombings and bombing attempts primarily conducted by an associated force. Therefore, the Court will **DENY** al-Hela's petition for a writ of habeas corpus. A separate order will issue.

SIGNED this __25th__ day of January 2019

Royce C. Lamberth
United States District Judge

███████████████

82

███████████

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ABDULSALAM ALI ABDULRAHMAN AL-HELA, | § § § | |
| *Petitioner,* | § § | |
| v. | § § | Case No. 05–cv–01048(RCL) |
| DONALD J. TRUMP *et al.,* | § § | |
| *Respondents.* | § | |

**ORDER**

In accordance with the accompanying memorandum opinion, the Court **DENIES** petitioner's petition for a writ of habeas corpus.

**IT IS SO ORDERED.**

SIGNED this 28th day of January 2019

*Royce C. Lamberth*

Royce C. Lamberth
United States District Judge

███████████